**UNITED STATES of America,**
**Appellant,**

v.

**James Regis WHITNER, Jr., a/k/a Jr.**

No. 00–3068.

United States Court of Appeals,
Third Circuit.

Argued June 19, 2000.

Filed July 20, 2000.

Harry Litman, United States Attorney, Bonnie R. Schlueter, (argued), Assistant United States Attorney, United States Attorney's Office, Western District of Pennsylvania, Pittsburgh, PA, Attorneys for Appellant.

David S. Shrager, (argued), Shrager & Medoff, Pittsburgh, PA, Attorneys for Appellee.

BEFORE: GREENBERG and WEIS, Circuit Judges, and SCHWARTZ,* District Judge.

## OPINION OF THE COURT

GREENBERG, Circuit Judge.

### I. BACKGROUND

The United States appeals from an order of the district court entered January 10, 2000, suppressing evidence obtained from the residence of defendant, James Regis Whitner, Jr., during a search conducted pursuant to a search warrant. A United States magistrate judge issued the search warrant on August 26, 1999, on the basis of an affidavit of Drug Enforcement Task Force Officer Anthony Rivotti. In a pretrial hearing on January 10, 2000, the district court held that the search warrant was not supported by probable cause due to a lack of evidence linking criminal activity to the location to be searched. Furthermore, the district court found the search warrant to be so lacking in probable cause so as to render official belief in its existence entirely unreasonable. Therefore, the district court held that the good-faith exception delineated in *United States v. Leon*, 468 U.S. 897, 104 S.Ct. 3405, 82 L.Ed.2d 677 (1984), did not apply and ordered the fruits of the search suppressed from evidence. Because we conclude that the magistrate judge had a sub-

---

* Honorable Murray M. Schwartz, Senior Judge of the United States District Court for the District of Delaware sitting by designation.

stantial basis for concluding that there was probable cause, *see Illinois v. Gates*, 462 U.S. 213, 238–39, 103 S.Ct. 2317, 2332, 76 L.Ed.2d 527 (1983), we will reverse.

The relevant facts are as follows. On August 24, 1999, Rivotti received information from the State Narcotics Task Force in Tucson, Arizona, that a parcel of suspicious nature was being mailed from Tucson to 3515 Frazier Street, Pittsburgh, Pennsylvania. The package was addressed to Linda Liggins with a return address from Corey Liggins. After obtaining a search warrant, and finding 5.75 pounds of what they believed was methamphetamine [1] within the package, the agents planted a beeper in the package.[2] On August 26, 1999, at 11:00 a.m. the package was delivered to 3515 Frazier Street and accepted by Tamara Liggins. Shortly thereafter, the beeper indicated that the package might have been opened, and agents entered the residence. The package, in fact, had not been opened. Two individuals, Tamara Liggins and Whitner, were present in the residence. The agents questioned and detained Liggins but later released her. However, they arrested Whitner, informed him of his Miranda rights, and questioned him. Liggins' and Whitner's responses during questioning along with the agents' corroborative investigation provided the information contained in the affidavit of probable cause underlying the search warrant at issue in this appeal.

The critical issue presented in this case is whether the affidavit on its face provided a substantial basis for the magistrate judge's finding of probable cause. Therefore, we set forth the full text of the statements contained in Rivotti's affidavit:

I, Anthony Rivotti, a Task Force Officer, am knowledgeable of the facts set forth herein based upon my own investigative efforts and from information provided to me by other Special Agents and other law enforcement officers.

Based upon my training, experience, and from information obtained from other law enforcement officers, your affiant knows that individuals involved in narcotics trafficking will often times resort to use of what is known as a 'stash house.' A stash house is a place or location utilized by drug traffickers to maintain their drugs, monies derived from the sale of controlled substances, drug paraphernalia such as grinders, cutting agents, and packaging material. Typically, stash houses are rented in the names of individuals trusted by the drug trafficker such as family members or paramours. This is done in an attempt to divert the attention of law enforcement. Furthermore, stash houses are often located within proximity to the area where the drug trafficker either lives or engages in drug dealing. This proximity provides the drug trafficker with access to his or her product and his or her profits. The location of a stash house also provides the drug trafficker with a measured sense of security in that it removes or insulates the trafficker from the scrutiny of local police and other drug traffickers. It is not uncommon for a stash house to be located in a residential neighborhood.

Based upon your affiant's experience and from information received from other law enforcement officers, the following items have been recovered from stash houses:

A. controlled substances, such as heroin, cocaine, crack, marihuana, and methamphetamine;

B. Drug paraphernalia, including but not limited t o scales, baggies, razor blades, cutting agents and/or other powders, and any and all devices used

---

1. The agents originally identified the substance as methamphetamine, but it later was found to be cocaine. The validity of the search is not in issue on this appeal.

2. A magistrate judge approved the beeper order.

to store and/or ingest and/or consume and/or prepare and/or convert drugs;

C. Books, records, receipts, notes, ledgers, and/o r other papers relating to the mailing, transportation, ordering, purchasing and/or distribution of controlled substances;

D. Books, records, receipts, bank statements and records, money drafts, letters of credit, money orders and/or cashier's checks, and other items evidencing the obtaining, secreting, transfer and/or concealment of assets and the obtaining, secreting, transfer, concealment and/or expenditure of money made from engaging in illegal drug trafficking;

E. Financial proceeds of unlawful trafficking in controlled substances, including, but not limited to, United States currency, financial instruments, precious metals, jewelry and/or other items of value and/or proceeds of drug transactions and evidence of financial transactions relating to obtaining, transferring, secreting, or the spending of large sums of money made from engaging in illegal drug trafficking activities;

F. Photographs of persons suspected of unlawful drug trafficking, and of assets, and or controlled substances, and of drug paraphernalia associated with the same;

G. Indicia of occupancy, residency, rental, usage and/or ownership of the premises described above, as well as the rental, usage and/or ownership of any vehicle actively engaged in the trafficking of controlled substances, including, but not limited to, rental agreements, titles, telephone bills, utility bills, vehicle registrations, canceled envelopes, safety deposit box keys, safe keys, as well as keys to the actual residence and/or premises, and/or vehicles;

H. Records of telephone numbers, address books, or papers which reflect names, addresses and/or telephone numbers of associates and coconspirators involved directly and indirectly in the trafficking of controlled substances, and/or associates who have a monetary consideration and/or interest in the illegal trafficking of controlled substances;

I. Any and all firearms utilized in the furtherance of the illegal acquisition, possession, sale, trade, distribution, storing, secreting, transfer, transportation and/or illegal trafficking of drugs. Any and all firearms used or intended for use to facilitate a violation of Title 21, United States Code, Sections 841(a)(1) and 846;

J. Mail matter (all classes), UPS, Priority and Express Mail packages, Federal Express packages, and packaging, and other correspondence which reflect names and addresses of suspected coconspirators in the trafficking and mailing of drugs; and

K. Any and all vehicles present, being utilized in the illegal sale, acquisition, trade, transfer, delivery, storing, secreting, transporting and/or trafficking of illegally possessed controlled substances.

On August 26, 1999, your affiant and other Special Agents effected the controlled delivery of approximately 5.75 pounds of methamphetamine to a residence located at 3515 Frazier Street, Pittsburgh, Pennsylvania. This delivery resulted in the arrest of JAMES REGIS WHITNER, JR.

TAMARA LIGGINS, who resides at the Frazier Street address, advised agents that WHITNER told her that he was expecting delivery of a package containing money. LIGGINS stated that WHITNER wanted to have the money sent via mail for fear that it would be discovered by metal detectors if it had been sent via air freight. [LIGGINS] further stated that she expected to be financially compensated by WHITNER for permitting him to use her residence as a drop point for the package. WHIT-

NER, according to LIGGINS, also stated that the package would be mailed under his (WHITNER'S) name.

LIGGINS stated further that WHITNER arrived at her residence on Sunday, August 22, 1999, and remained there until Tuesday, August 24, 1999. During this time period, WHITNER often remarked that he was 'waiting for his thing,' which LIGGINS took to mean as a reference to the package of money.

LIGGINS consented to a search of her residence. With the exception of several telephone and address books, no other items commonly associated with narcotics trafficking were found.

WHITNER, after being advised of his Miranda warnings, was also interviewed by agents at the Frazier Street address. WHITNER stated that he was a student at Edinboro State University, which [is] located in Edinboro, Pennsylvania.

WHITNER advised the agents that he was running late and should have been at the university some several hours ago. It should be noted, however, that during this encounter, WHITNER was not dressed and was clad only in his underwear.

WHITNER further informed the agents that he lives with his mother at 37–A Midway Drive, West Mifflin, Pennsylvania 15122. WHITNER also stated that his mother's name is Sherry A. Williams.

In response to agent's questions, WHITNER indicated that his automobile, a White Chevrolet Caviler [sic] bearing Pennsylvania registration number BRP 6159, was parked near the Frazier Street address. WHITNER consented to a search of the automobile. It should be noted that at his Preliminary Examination, which occurred on August 26, 1999, WHITNER informed United States Magistrate Judge Kenneth Benson that he owned a 1992 Camaro automobile.

During the ensuing search of the car, agents discovered a bag containing a quantity of 9 millimeter and .45 caliber handgun ammunition as well as an empty box of .40 caliber ammunition. A check with the Pennsylvania Department of Motor Vehicles revealed that the Chevrolet Caviler is registered to Sherry A. Williams.

Despite the fact that WHITNER had told agents that he was late for school, there were no clothes, books or other similar items in the automobile.

Meanwhile, TAMARA LIGGINS, informed agents that WHITNER resided at an apartment located in Monroeville, Pennsylvania. Agents subsequently discovered that WHITNER had rented an apartment located at 1115 Fox Hill Drive, Monroeville, Pennsylvania 15146. Agents further learned that the telephone number for this apartment is (412) 372–2040. Telephone number (412) 372–2040 is in the name of JAMES REGIS WHITNER, JR. Your affiant dial[ed] telephone number (412) 372–2040. The call was eventually answered by an answering machine. The voice recorded on the machine sounds similar to WHITNER'S voice. This residence may be fully described as follows: a multi-unit, three story apartment building marked with the sign 'Garden's One' and bearing the number 1115, along with a brown wooden door with a gold colored door knocker and the number 205 marked on the middle of the door.

Agents confronted WHITNER with the information concerning the 1115 Fox Hill Drive apartment. WHITNER became very nervous and appeared to be ill at ease. WHITNER stated that the agents should speak to ELLIS LEE HARRIS, a man whom WHITNER identified as being his cousin. WHITNER further stated that HARRIS could explain things.

LIGGINS advised agents that WHITNER'S cousin, ELLIS LEE HARRIS, who is also known to her as PETE HARRIS, is a drug dealer, and controlled the drug trade in New Kensing-

ton, Pennsylvania. A criminal history check reveals that HARRIS was arrested on state narcotics charges in 1990 and 1991. HARRIS was also convicted on drug charges in 1994. Your affiant has also been able to determine that HARRIS lives in New Kensington, Pennsylvania. Monroeville, Pennsylvania is located approximately five miles from New Kensington, Pennsylvania.

Your affiant has also learned that WHITNER is a student at the university and classes are scheduled to start on August 30, 1999.

Agents also contacted the building manager for the apartment located at 1115 Fox Hill Drive. The build[ing] manager advised that WHITNER had rented the apartment on July 1, 1999 on a month-by-month basis. It should be noted that Edinboro University is approximately 130–50 miles from Monroeville, Pennsylvania.

On August 26, 1999, an order of temporary detention was issued against WHITNER by United States Magistrate Judge Benson. It is unknown by your affiant at the time of application for this search warrant whether HARRIS has the means to access the premises in question. Under these circumstances, your affiant requests permission to conduct a nighttime search.

WHEREFORE, based on the foregoing, information detailed above, your affiant has probable cause to believe that located at 1115 Fox Hill Drive, Apartment 205, Monroeville, Pennsylvania, are: [items listed previously in the affidavit in sections A K].

All of which constitute the fruits, instrumentalities, or evidence of violations of Title 21, United States Code, Section 841(a)(1).

The magistrate judge reviewed the affidavit and determined that there was probable cause to believe there was contraband at 1115 Fox Hill Drive, Monroeville, the premises identified in the affidavit, and thus issued a search warrant for the premises authorizing seizure of the items specified in the affidavit. Agents executed the search warrant on August 26, 1999, and recovered: (1)181.7 grams of crack, (2) 377.7 grams of cocaine hydrochloride, (3) approximately 2 .5 kilograms of marijuana, (4) $14,800 in U.S. currency, (5) two electronic scales, (6) a cellular telephone, and (7) miscellaneous items of indicia of occupancy. On September 22, 1999, a grand jury in the Western District of Pennsylvania indicted Whitner on four counts of conspiring to distribute cocaine and possession of cocaine, cocaine base, and marijuana with the intent to distribute each.[3] On December 21, 1999, Whitner filed a pretrial motion to suppress the evidence[4] obtained as a result of the search of the Monroeville apartment. As noted, the district court granted the motion to suppress, holding that the search warrant was unsupported by probable cause and is not saved by the good-faith exception established in *Leon*. The government appeals the suppression order. We have jurisdiction to hear this appeal by virtue of .18 U.S.C. § 3731.

## II. DISCUSSION

 There are two relevant standards of review on this appeal between which we must distinguish at the outset of our probable cause analysis. The first is our review of the district court's decision and the second is our review of the magistrate

3. Count one charges Whitner with conspiring to distribute in excess of 500 grams of cocaine from August 22, 1999, until August 26, 1999, in violation of 21 U.S.C. §§ 841(a)(1) and 841(b)(1)(B)(ii). The remaining three counts charge Whitner with possession of cocaine base (Count Two), cocaine (Count Three), and marijuana (Count Four) on August 26, 1999, all with the intent to distribute in violation of 21 U.S.C. § 841(a)(1).

4. Whitner also filed pretrial motions for discovery, suppression of statements and severance of the counts. The court granted the motion for discovery but denied the other two motions.

judge's probable cause determination. Inasmuch as the district court confined its decision to whether the information within the four corners of the affidavit established probable cause to issue the search warrant, our review of the district court's decision is plenary. As we indicated in *United States v. Conley*, 4 F.3d 1200, 1204 (3d Cir.1993), "When a district court, in reviewing a magistrate's determination of probable cause, bases its probable cause ruling [solely] on facts contained in an affidavit, we exercise plenary review over the district court's decision." *See also United States v. Jones*, 994 F.2d 1051, 1055 & n. 5 (3d Cir.1993).

▪ In contrast, a reviewing court may not conduct a de novo review of the magistrate judge's determination of probable cause. *Conley*, 4 F.3d at 1205. "[B]oth we and the district court exercise only a deferential review of the initial probable cause determination made by the magistrate." *Id. See Illinois v. Gates*, 462 U.S. at 236, 103 S.Ct. at 2331 ("A magistrate's 'determination of probable cause should be paid great deference by reviewing courts.' ") (quoting *Spinelli v. United States*, 393 U.S. 410, 419, 89 S.Ct. 584, 591, 21 L.Ed.2d 637 (1969)). A reviewing court must determine only that the magistrate judge had a "substantial basis" for concluding that probable cause existed to uphold the warrant. *Gates*, 462 U.S. at 238, 103 S.Ct. at 2331. In *Jones* we summarized the "substantial basis" standard, commenting that:

> We recognize that a different magistrate judge might have found the affidavit insufficient to support a warrant. However, our role is not to make our own assessment as to whether probable cause existed. Rather, we are constrained to determine only whether the affidavit provides a sufficient basis for the decision the magistrate judge actually made.

*Jones*, 994 F.2d at 1057. Although our role in reviewing the magistrate judge's decision is limited, we have explained that deference to the judge's determination "does not simply mean that reviewing courts should rubber stamp a magistrate's conclusions." *Id.* at 1055.

▪ In determining whether a "substantial basis" exists for the magistrate judge's decision we must keep in mind the judge's task in authorizing search warrants. "The task of the issuing magistrate is make a practical commonsense decision whether, given all the circumstances set forth in the affidavit before him ... there is a fair probability that contraband or evidence of a crime will be found in a particular place." *Gates*, 462 U.S. at 238, 103 S.Ct. at 2332. In *Gates*, the Supreme Court stated that "probable cause is a fluid concept—turning on the assessment of probabilities in particular factual contexts—not readily, or even usefully, reduced to a neat set of legal rules." 462 U.S. at 232, 103 S.Ct. at 2329. "The supporting affidavit must be read in its entirety and in a commonsense and nontechnical manner." *Conley*, 4 F.3d at 1206 (citing *Gates*, 462 U.S. at 230–31, 103 S.Ct. at 2328). "[S]tatements in an affidavit may not be read in isolation—the affidavit must be read as a whole." *Conley*, 4 F.3d at 1208 (quoting *United States v. Brown*, 3 F.3d 673, 678 n. 5 (3d Cir.1993)). Furthermore, "The issuing judge or magistrate may give considerable weight to the conclusions of experienced law enforcement officers regarding where evidence of a crime is likely to be found and is entitled to draw reasonable inferences about where evidence is likely to be kept, based on the nature of the evidence and the type of offense." *United States v. Caicedo*, 85 F.3d 1184, 1192 (quoting *United States v. Lawson*, 999 F.2d 985, 987 (6th Cir.1993) (internal quotations omitted)). To uphold the magistrate judge's probable cause determination, we must determine only that the judge had a substantial basis for finding that drug-related evidence would be found in the Monroeville apartment.

▪ Contrary to the district court's opinion, consideration of all the facts con-

tained in Rivotti's affidavit and normal inferences drawn therefrom provided a substantial basis for a finding of probable cause to search the Fox Hill premises.[5] The district court based its determination on an alleged lack of nexus between the crime for which Whitner was arrested and the location to be searched. We begin by noting the distinction between probable cause to arrest and probable cause to search. As we stated in Jones, "probable cause to arrest does not automatically provide probable cause to search the arrestee's home." 994 F.2d at 1055. The distinction turns on the fact that "search warrants are directed, not at persons, but at property where there is probable cause to believe that instrumentalities or evidence of crime will be found." *Conley*, 4 F.3d at 1207 (quoting *United States v. Tehfe*, 722 F.2d 1114, 1117–18 (3d Cir. 1983) (internal citation omitted)).

As the district court noted, Rivotti's supporting affidavit does not provide direct evidence that contraband would be found at the location to be searched. We repeatedly have noted, however, that direct evidence linking the crime to the location to be searched is not required to support a search warrant. In *Jones*, we remarked that:

> While ideally every affidavit would contain direct evidence linking the place to be searched to the crime, it is well established that direct evidence is not required for the issuance of a search warrant. Instead, probable cause can be, and often is, inferred by 'considering the type of crime, the nature of the items sought, the suspect's opportunity for concealment and normal inferences about where a criminal might hide stolen property.'

*Jones*, 994 F.2d at 1056 (quoting *United States v. Jackson*, 756 F.2d 703, 705 (9th Cir.1985)). *See also Conley*, 4 F.3d at 1207 ("direct evidence linking the place to be searched to the crime is not required"); *accord United States v. Malin*, 908 F.2d 163, 165–66 (7th Cir.1990); *United States v. Jenkins*, 901 F.2d 1075, 1080–81 (11th Cir.1990); *United States v. Anderson*, 851 F.2d 727, 729 (4th Cir.1988); *United States v. Charest*, 602 F.2d 1015, 1017 (1st Cir. 1979). In *Jones*, we went on to note that although probable cause to arrest does not automatically provide probable cause to search the defendant's home, the fact that probable cause to arrest has been established increases the probability that the defendant is storing evidence of that crime in the defendant's residence. 994 F.2d at 1055–56.

In the case of drug dealers, a number of other courts of appeals have held that evidence of involvement in the drug trade is likely to be found where the dealers reside. *See United States v. Feliz*, 182 F.3d 82, 87–88 (1st Cir.1999) (It reasonably could be supposed that a drug dealer stored evidence of dealing at his home, though no drug trafficking was observed to occur there.), *cert. denied*, — U.S. —, 120 S.Ct. 942, 145 L.Ed.2d 819 (2000); *United States v. McClellan*, 165 F.3d 535, 546 (7th Cir.) ("[I]n issuing a search warrant, a magistrate is entitled to draw reasonable inferences about where the evidence is likely to be kept .... *and ... in the case of drug dealers evidence is likely to be found where the dealers live.*") (quoting *United States v. Reddrick*, 90 F.3d 1276, 1281 (7th Cir.1996) (internal quotations and citations omitted)), *cert. denied*, 526 U.S. 1125, 119 S.Ct. 1781, 143 L.Ed.2d 809 (1999); *United States v. Henson*, 123

---

5. In his affidavit, Rivotti inferred from the available facts that it was most likely that the Fox Hill apartment was a stash house for Harris. We conclude, however, that the facts contained in the affidavit provide a stronger inference that contraband was likely to be found at the Fox Hill apartment because the apartment was Whitner's residence, than be- cause it was a stash house for Harris. Therefore, we analyze the sufficiency of probable cause to search the apartment as Whitner's residence and need not reach the question of whether the lesser quantum of evidence suggesting that the Fox Hill apartment was a stash house would be sufficient to support probable cause.

F.3d 1226, 1239 (9th Cir.1997) ("*In the case of drug dealers, evidence is likely to be found where the dealers live.*") (internal quotation omitted); *United States v. Luloff,* 15 F.3d 763, 768 (8th Cir.1994) (observations of drug trafficking occurring away from dealer's residence along with officer's statement in affidavit that drug dealers often store evidence in their residences provided probable cause for search of dealer's house); *United States v. Thomas,* 989 F.2d 1252, 1255 (D.C.Cir.1993) (per curiam) (observations of drug trafficking occurring away from dealer's residence can provide probable cause for search of dealer's house); *United States v. Williams,* 974 F.2d 480, 482 (4th Cir.1992) (per curiam) (affidavit establishing that known drug dealer was residing in a motel room established sufficient probable cause to search motel room for drug paraphernalia); *United States v. Davidson,* 936 F.2d 856, 859–60 (6th Cir.1991) (evidence of pattern of defendant's involvement in drug-dealing established probable cause to search defendant's residence although there was no direct evidence of drug dealing occurring at the residence); *United States v. Angulo–Lopez,* 791 F.2d 1394, 1399 (9th Cir.1986) ("In the case of drug dealers, evidence is likely to be found where the dealers live."); *United States v. Cruz,* 785 F.2d 399, 406 (2d Cir.1986) (probable cause established for search of drug dealer's apartment although defendant was not seen using the apartment).

The rationale underlying the foregoing line of cases is that evidence associated with drug dealing needs to be stored somewhere, and that a dealer will have the opportunity to conceal it in his home. After all, a dealer logically could conclude that his residence is the best, and probably the only, location to store items such as records of illicit activity, phone books, address books, large amounts of cash, assets purchased with proceeds of drug transactions, guns to protect drugs and cash, and large quantities of drugs to be sold.

Rivotti's affidavit stated that Whitner had been arrested as a result of a controlled delivery of 5.75 pounds of methamphetamine. It is reasonable to infer from the delivery of such a large quantity of drugs that the individual arrested as a result of the seizure is involved in selling drugs, rather than merely using them. In addition, it is reasonable to infer from the fact that such a large delivery was entrusted to Whitner and that he had arranged a specific drop off point, that he was familiar with drug transactions. In addition, the agents found ammunition in Whitner's car and he told them that he was in some way associated with a known drug dealer, Ellis Lee Harris. Viewed in a common sense manner, these facts and the inferences to be drawn from them reasonably could lead a magistrate judge to conclude that Whitner was involved in the drug trade.

The affidavit also provides a substantial basis for a finding that the Monroeville apartment was Whitner's residence. The apartment was rented in Whitner's name, the telephone number was listed in his name, and the voice on the answering machine sounded like his. In addition, an informant, Tamara Liggins, whose answers to the agents' questions were corroborated by independent investigation, and thus was demonstrated to be reliable, told the agents that Whitner resided in the Monroeville apartment.

This information to which we have referred would permit the reasonable inferences that Whitner was a drug dealer, and that the Monroeville apartment was his residence. However, we need not decide whether the fact that Whitner appears to be a drug dealer is sufficient under the circumstances of this case to conclude that he would be likely to store evidence of his drug dealing at his residence. The affidavit offers an additional important piece of evidence linking the crime to the Monroeville location. Whitner was deceptive in his answers when the agents asked him about the location of his residence, and continued to act suspiciously when they

directly confronted him about the Monroeville apartment. When the agents asked Whitner where he resided, he responded that he lived with his mother at 37–A Midway Drive, West Mifflin, Pennsylvania. The agents then learned through Tamara Liggins and independent investigation, that Whitner had rented the Monroeville apartment. When the agents asked Whitner about the Monroeville apartment, he became nervous and referred them to a convicted drug dealer to answer any questions about the apartment. This type of suspicious and deceptive response to questioning leads to a reasonable inference that Whitner was attempting to conceal the existence of the apartment and his association with the apartment. This attempt at concealment when combined with the other information Rivotti set forth in his affidavit logically suggests that Whitner was storing some evidence of illegal activity at the apartment which he did not want the agents to discover.

In *Caicedo* the Court of Appeals for the Sixth Circuit found that there was probable cause to search the residence of defendant Ryan. 85 F.3d at 1193. The central facts in the affidavit were that a passenger in Ryan's car was arrested for possession of cocaine and that Ryan attempted to conceal his true address from the police. According to the affidavit supporting the warrant issued for Ryan's home, "Ryan attempted to conceal his correct address from police, and . . . 'the reason for hiding the correct residence *could be* that further evidence *may be* located at this location which *could be* used against Ryan in this particular investigation.' " *Id.* This is a reasonable inference that may be drawn when an individual involved in drug dealing and being questioned about the involvement, conceals his true address from the police.

Assessing the affidavit as a whole, in a commonsense manner, the affidavit demonstrates that an individual, Whitner, involved in drug dealing, was attempting to conceal his address. This situation, combined with Rivotti's opinion that evidence of drug dealing was likely to be found in Whitner's apartment, provided a substantial basis from which the magistrate judge could conclude that evidence of drug dealing would be found in the Monroeville apartment. In this regard we point out that the issue is not whether we or any other magistrate judge would have found probable cause predicated on Rivotti's affidavit. We consider only whether the magistrate judge who did make the decision had a substantial basis from which to reach his conclusion. We determine that he had that substantial basis.

We acknowledge that it would have been preferable if Rivotti could have supplied more information linking the premises to be searched to the criminal activity. Nevertheless, our reasoning in *Jones* is most pertinent where we noted that:

> While [the officer writing the affidavit] might have been able to supply the magistrate judge with a stronger link to the defendants' residences, the fact remains that he did bring the evidence to a magistrate judge, who determined that there was probable cause to issue the warrants. In reaching our conclusion, we are mindful that a 'grudging or negative attitude by reviewing courts towards warrants' is inconsistent with the Fourth Amendment's strong preference for searches conducted pursuant to a warrant.

*Jones,* 994 F.2d at 1057 (quoting *United States v. Ventresca,* 380 U.S. 102, 108, 85 S.Ct. 741, 746, 13 L.Ed.2d 684 (1965)).

 As we did in *Jones,* we will reverse the district court's order of suppression recognizing that "the resolution of doubtful or marginal cases in this area should be largely determined by the preference to be accorded to warrants." *Ventresca,* 380 U.S. at 109, 85 S.Ct. at 746.[6]

---

6. We do not reach the question of whether the good faith exception established in *United States v. Leon,* 468 U.S. 897, 104 S.Ct. 3405, 82 L.Ed.2d 677, applies because we find that

### III. CONCLUSION

We will reverse the order of the district court suppressing the evidence seized from 1115 Fox Hill Drive, Monroeville, on August 26, 1999, and remand the matter to the district court for further proceedings.

the magistrate judge had a substantial basis from which to conclude that probable cause existed.