**UNITED STATES of America**

v.

**Carol Anne BOND, Appellant.**

**No. 08–2677.**

United States Court of Appeals, Third Circuit.

Argued March 23, 2009.

Opinion Filed: Sept. 17, 2009.

Robert E. Goldman, Esquire, (Argued), Fox Rothschild, Warrington, PA, Eric E. Reed, Esquire, Fox Rothschild, Philadelphia, PA, Counsel for Appellants.

Laurie Magid, Acting United States Attorney, Paul G. Shapiro, (Argued), Assistant United States Attorney, Office of the United States Attorney, Philadelphia, PA, Counsel for Appellees.

Before: RENDELL, AMBRO, and JORDAN, Circuit Judges.

## OPINION OF THE COURT

AMBRO, Circuit Judge.

Carol Anne Bond pled guilty to two counts of possessing and using a chemical weapon, and two counts of mail theft, in connection with her efforts to harm a former friend. She now appeals the District Court's pretrial order denying her motions to dismiss the charges against her and to suppress evidence. She also challenges her sentence. For the reasons that follow, we affirm each of the Court's actions.

## I.  Factual and Procedural Background

Bond was excited when her closest friend, Myrlinda Haynes, announced that she was pregnant. Bond's excitement turned to rage when she learned that her husband, Clifford Bond, was the child's father. She vowed revenge.

Planning to poison Haynes, Bond (a trained microbiologist) stole a quantity of 10–chloro10H–phenoxarsine from her employer, the chemical manufacturer Rohm and Haas, and ordered over the Internet a vial of potassium dichromate. These chemicals have the rare ability to cause

toxic harm to individuals through minimal topical contact.[1]

Bond attempted to poison Haynes with the chemicals at least 24 times over the course of several months. She often would spread them on Haynes's home doorknob, car door handles, and mailbox. Haynes noticed the chemicals and usually avoided harm, but on one occasion sustained a chemical burn to her thumb.

Haynes called her local police about the chemical attacks. They suggested that the substance might be cocaine and told Haynes to clean her car and door handles on a regular basis. Unsatisfied (to say the least) with this response, Haynes complained to her local postal carriers about the chemicals on her mailbox. They referred the matter to the United States Postal Inspection Service.

Based on Haynes's complaint, postal inspectors placed surveillance cameras in and around Haynes's home. These cameras captured Bond opening Haynes's mailbox, stealing a business envelope, and placing potassium dichromate inside Haynes's car muffler. They specifically showed Bond going back and forth between her car and Haynes's with the chemicals.

After testing the chemicals that Bond placed in Haynes's muffler, postal inspectors attempted to trace their origin to the Rohm and Haas center where Bond worked as a technical assistant. The inspectors determined that nearly four pounds of potassium dichromate were missing from a common storage area to which Bond had access.

With this information, the inspectors sought and received an arrest warrant for Bond and search warrants for her car and home. They supported their warrant requests with an affidavit detailing the gathered evidence, including the videotaped footage, results of the chemical analyses, and the report of the missing chemicals. The affidavit also explained Bond's responsibilities at Rohm and Haas, described her car and home, and noted that Haynes had identified Bond from a photo array.

Postal inspectors arrested Bond and took her to a holding cell in the Philadelphia Post Office. Once there, Bond acknowledged and waived her constitutional rights, and admitted to taking the chemicals from Rohm and Haas. Meanwhile, other inspectors executed the search warrants, finding a piece of Haynes's mail and amounts of the chemicals in Bond's home and car.

A grand jury in the Eastern District of Pennsylvania charged Bond with two counts of possessing and using a chemical weapon, in violation of 18 U.S.C. § 229(a)(1), a criminal statute implementing the treaty obligations of the United States under the 1993 Chemical Weapons Convention. The grand jury also charged Bond with two counts of mail theft, in violation of 18 U.S.C. § 1708.

Bond moved to suppress certain evidence and to dismiss the two chemical weapons charges. She claimed that the affidavits supporting the search warrants failed to establish probable cause to search her home and car, and she argued that 18 U.S.C. § 229 is unconstitutional because it violates principles of federalism embodied in our Constitution and the fair notice requirements of its Due Process Clause.

---

[1]. Half a teaspoon of 10–chloro–10H–phenoxarsine ingested is lethal to an adult, while a few crystals of the substance is highly toxic. The same is true for potassium dichromate, with less than one-quarter of a teaspoon ingested being lethal and an even smaller number of crystals is toxic. App. at 239–56.

The District Court denied Bond's motions. It ruled that § 229 did not impinge on principles of federalism because it "was enacted by Congress and signed by the President under the necessary and proper clause of the Constitution ... [to] comply with the provisions of a treaty." App. 168. The Court next concluded that "the statute is not vague, [because] it is clear that if anybody uses a toxic chemical for other than peaceful purposes, th[at] person can be prosecuted." *Id.* at 169. It ruled as well that "the search warrants were properly issued," because sufficient evidence existed to permit a "probable cause conclusion that a substantial amount of potassium dichromate would probably be found in [Bond's] vehicle or where she lived." *Id.* at 170–72.

Following the Court's denial of her motions, Bond pled guilty to all charges, reserving her right to appeal. The Court then held a sentencing hearing at which it enhanced Bond's total offense level by two levels based on a determination under U.S.S.G. § 3B1.3 that she used a special skill in the commission or her offense. The Court ultimately sentenced Bond to six years' imprisonment, five years of supervised release, a $2,000 fine, and restitution of $9,902.79. Bond appeals.

## II. Jurisdiction and Standard of Review

The District Court had jurisdiction under 18 U.S.C. § 3231. We have jurisdiction under 28 U.S.C. § 1291 and 18 U.S.C. § 3742.

■■■ We review *de novo* a challenge to the constitutionality of a criminal statute. *See De Leon–Reynoso v. Ashcroft,* 293 F.3d 633, 635 (3d Cir.2002). We consider "denial of a motion to suppress for clear error as to the underlying factual findings and exercise[ ] plenary review of the District Court's application of the law to those facts." *United States v. Perez,* 280 F.3d 318, 336 (3d Cir.2002). We likewise review *de novo* the District Court's interpretation of the Sentencing Guidelines and consider its related findings of fact for clear error. *See United States v. Wood,* 526 F.3d 82, 85 (3d Cir.2008).

## III. Discussion

Bond claims that (1) 18 U.S.C. § 229 is unconstitutional, (2) the search warrants for her home and car were invalid, and (3) her conduct did not justify a sentence enhancement for using a special skill in the commission of a crime. We reject each of these claims.

### A. Constitutionality of 18 U.S.C. § 229

The United States, along with many other nations, signed the Chemical Weapons Convention in 1993 to ensure "the complete and effective prohibition of the development, production, acquisition, stockpiling, retention, transfer and use of chemical weapons...." 32 I.L.M. 800, 804 (1993). This treaty states, among other things, that each signing nation "shall[,] in accordance with its constitutional process, adopt the necessary measures to implement its obligations under this Convention." *Id.* at 810. It specifically requires a complying nation to "[p]rohibit natural and legal persons anywhere on its territory ... from undertaking any activity prohibited ... under this Convention, including enacting penal legislation with respect to such activity." *Id.*

The United States fulfilled its responsibilities under the treaty through the Chemical Weapons Convention Implementation Act of 1998, 22 U.S.C. § 6701, and the Act's associated penal provision, 18 U.S.C. § 229. In relevant part, § 229 reads:

(a) Unlawful Conduct—Except as provided in subsection (b), it shall be unlawful for any person knowingly—

(1) to develop, produce, otherwise acquire, transfer directly or indirectly, receive, stockpile, retain, own, possess, or use, or threaten to use, any chemical weapon; or

(2) to assist or induce, in any way, any person to violate paragraph (1), or to attempt to conspire to violate paragraph (1).

18 U.S.C. § 229(a). "Chemical weapon" is defined as a "toxic chemical and its precursors, except where intended for a purpose not prohibited under this chapter as long as the type and quantity is consistent with such a purpose." *Id.* at § 229F(1)(A). "Toxic chemical" is defined in part as "any chemical which through its chemical action on life processes can cause death, temporary incapacitation or permanent harm to humans or animals." *Id.* at § 299F(8)(A). Importantly, § 229 neither has a requisite federal interest element (*i.e.,* a requirement that an offender's conduct affect interstate commerce or a federal person, possession, or interest) nor states a basis for its enactment beyond the Chemical Weapons Convention (*i.e.,* it does not assert authority under the Commerce Clause or other constitutional provision).

Based on this framework, Bond asserts that § 229 violates constitutional principles of federalism because it is not "based on a valid exercise of constitutional authority," and does not "require proof of a federal interest." Bond's Br. at 10. She also claims that the provision is unconstitutionally vague and overbroad "by virtue of its enormous scope" and its failure to "provide fair notice" of the conduct covered by its terms. *Id.* at 28.

## 1. Federalism Challenge

■ "Under our federal system[,] the administration of criminal justice rests with the States except as Congress, acting within the scope of [its] delegated powers, has created offenses against the United States." *Screws v. United States,* 325 U.S. 91, 109, 65 S.Ct. 1031, 89 L.Ed. 1495 (1945). Bond contends that, by permitting prosecution of "localized" offenses "without regard to the ... federalism boundaries enshrined in the Constitution[,]" § 229 "signals a massive and unjustifiable expansion of federal law enforcement into [the] state-regulated domain." Bond's Br. at 10–11, 16. Specifically, she argues that because the statute "brings citizens into the federal criminal area for conduct not properly the subject of federal prosecutors," *id.* at 11, and because it "significantly restrike[s] the delicate balance between the federal and state governments," it violates "the unique system of federalism" protected by the Tenth Amendment to the Constitution.[2] *Id.*

The Government responds that the Tenth Amendment is no impediment to the operation of § 229 because Congress had authority to enact it under the Necessary and Proper Clause of the Constitution as a law enforcing its Treaty Power.[3] Relying

2. The Tenth Amendment provides in full: "The powers not delegated to the United States by the Constitution, nor prohibited by it to the States, are reserved to the States respectively, or to the people." U.S. Const. amend. X.

3. The Necessary and Proper Clause gives Congress the power "[t]o make all Laws which shall be necessary and proper for car-

rying into Execution the foregoing Powers, and all other Powers vested by this Constitution in the Government of the United States, or in any Department or Officer thereof." *Id.* at art. I, § 8, cl. 2. The Treaty Power permits the President, "by and with the Advice and Consent of the Senate, to make Treaties, provided two thirds of the Senators present concur...." *Id.* at art. II, § 2, cl. 2.

on *Missouri v. Holland,* 252 U.S. 416, 432, 40 S.Ct. 382, 64 L.Ed. 641 (1920), the Government asserts that § 229 need not be authorized by a specific power given to Congress, nor contain a requisite federal interest element, because the Chemical Weapons Convention is a valid treaty and "[i]f [a] treaty is valid there can be no dispute about the validity of the statute [implementing it] under Article I, § 8, as a necessary and proper means to execute the powers of the Government." Gov't's Br. at 27 (quoting *United States v. Lue,* 134 F.3d 79, 84 (2d Cir.1998)). The Government highlights as well the declaration in *Holland* that "[i]t is obvious that there may be matters of the sharpest exigency for the national well being that an act of Congress could not deal with but that a treaty followed by such an act could." 252 U.S. at 433, 40 S.Ct. 382; *see also United States v. Lara,* 541 U.S. 193, 201, 124 S.Ct. 1628, 158 L.Ed.2d 420 (2004). Thus, states the Government, even if § 229 were "otherwise prohibited legislation" under the Tenth Amendment, "the treaty power invest[ed] Congress with independent authority to pass [it]." Gov't's Br. at 26.

These arguments appear to present issues of first impression in our Court. They raise questions about what constitutional authority treaty-implementing legislation must cite, and how far such legislation may reach into an area over which

"[s]tates possess primary authority." *Brecht v. Abrahamson,* 507 U.S. 619, 635, 113 S.Ct. 1710, 123 L.Ed.2d 353 (1993). The arguments also ask us to wade into the debate over the scope and persuasiveness of the decision in *Holland. Compare United States v. Ferreira,* 275 F.3d 1020, 1027–28 (11th Cir.2001) (applying *Holland* to hold that "because Congress's authority under the Necessary and Proper clause extends beyond those powers specifically enumerated in Article I, section 8, it may enact laws necessary to effectuate the treaty power" (internal quotations omitted)), *and Lue,* 134 F.3d at 84–85 (same), *with Oneida Indian Nation of New York v. New York,* 860 F.2d 1145, 1163 (2d Cir.1988) (remarking that, despite *Holland,* the ability of the treaty power to override "state prerogatives" is uncertain).[4]

But before we can reach the merits of these arguments, we must ensure that Bond has standing to raise a Tenth Amendment challenge to § 229. *See Steel Co. v. Citizens for a Better Env't,* 523 U.S. 83, 101–02, 118 S.Ct. 1003, 140 L.Ed.2d 210 (1998) (requiring that courts decide jurisdictional issues before considering the merits of a claim). Because this inquiry implicates our jurisdiction, we conduct it even though the parties did not address it in their initial briefs. *See Donovan v.*

---

4. In addition, a significant scholarly debate exists over whether the Supreme Court correctly decided *Holland. Compare* David M. Golove, *Treaty–Making and the Nation: The Historical Foundations of the Nationalist Conception of the Treaty Power,* 98 Mich. L.Rev. 1075 (2000) (asserting that constitutional history and "the fundamental principle of national supremacy" support *Holland's* recognition of broad congressional authority to enact treaty-enforcing legislation), *with* Nicholas Rosenkranz, *Executing the Treaty Power,* 118 Harv. L.Rev. 1867 (2005) (arguing that *Holland* "is wrong and ... should be overruled"

because constitutional text, history, and structure, along with practical considerations, weigh against it). This debate suggests mounting interest for reconsideration of the rationale for *Holland's* holding, especially arguments rooted in the text and history of the Constitution. *See* Curtis A. Bradley, *The Treaty Power and American Federalism,* 97 Mich. L.Rev. 390, 391–402, 423–61 (1998); Rosenkranz, *supra,* at 1880–1918; Edward T. Swaine, *Does Federalism Constrain the Treaty Power?,* 103 Colum. L.Rev. 403, 404–533 (2003).

*Punxsutawney Area Sch. Bd.*, 336 F.3d 211, 216 (3d Cir.2003).[5]

In *Tennessee Electric Power Co. v. Tennessee Valley Authority*, 306 U.S. 118, 143–144, 59 S.Ct. 366, 83 L.Ed. 543 (1939), utility companies chartered in Tennessee argued that the sale of electrical power by the federally chartered Tennessee Valley Authority was an impermissible federal regulation of a local matter in violation of the Tenth Amendment. The Supreme Court rejected this argument, concluding that the private companies lacked standing to maintain their claim:

> The sale of government property in competition with others is not a violation of the Tenth Amendment. As we have seen[,] there is no objection to the Authority's operations by the states, and, if this were not so, the [utility companies], absent the states or their officers, have no standing in this suit to raise any question under the [Tenth] [A]mendment.

*Id.* at 144, 59 S.Ct. 366.[6]

Despite this explicit holding, courts of appeals are split on whether private parties have standing to challenge a federal act on the basis of the Tenth Amendment. Two circuit courts have allowed private parties to bring such challenges. *See Gillespie v. City of Indianapolis*, 185 F.3d 693, 703–04 (7th Cir.1999), *cert. denied*, 528 U.S. 1116, 120 S.Ct. 934, 145 L.Ed.2d 813 (2000); *Atlanta Gas Light Co. v. U.S. Dep't of Energy*, 666 F.2d 1359, 1368 n. 16 (11th Cir.1982).[7] Five have not. *See United States v. Hacker*, 565 F.3d 522, 525–527 (8th Cir.2009); *Oregon v. Legal Servs. Corp.*, 552 F.3d 965, 971–72 (9th Cir.2009); *Brooklyn Legal Servs. Corp. v. Legal Servs. Corp.*, 462 F.3d 219, 234–35 (2d Cir.2006), *cert. denied*, —— U.S. ——, 128 S.Ct. 44, 169 L.Ed.2d 11 (2007); *Medeiros v. Vincent*, 431 F.3d 25, 33–36 (1st Cir.2005), *cert. denied*, 548 U.S. 904, 126 S.Ct. 2968, 165 L.Ed.2d 951 (2006); *United States v. Parker*, 362 F.3d 1279, 1284–85 (10th Cir.2004), *cert. denied*, 543 U.S. 874, 125 S.Ct. 88, 160 L.Ed.2d 124 (2004).

The Seventh Circuit Court stated most clearly the rationale for permitting private parties, notwithstanding *Tennessee Electric*, to raise Tenth Amendment concerns absent the involvement of a state. Deciding that a state police officer had standing independently to maintain a Tenth Amendment claim against a federal gun regulation, the Court emphasized that "standing barriers have been substantially lowered in

---

**5.** After identifying standing as an unresolved question in Bond's federalism challenge to § 229, we requested and received supplemental briefing from the parties.

**6.** Bond argues that the language regarding private party Tenth Amendment standing in *Tenn. Elec. Power Co.* "is textbook *dicta* and thus does not bind this Court." Bond's Supp. Br. at 2. But "[t]he [Supreme] Court dismissed the Tenth Amendment claim after analyzing both the standing issue and the merits, and hence, the former holding is an alternative ground, rather than *obiter dictum*." *Medeiros v. Vincent*, 431 F.3d 25, 34 (1st Cir. 2005) (citing *California v. United States*, 438 U.S. 645, 689 n. 10, 98 S.Ct. 2985, 57 L.Ed.2d 1018 (1978)). Furthermore, because the standing question in *Tenn. Elec. Power Co.*

concerned the constitutional jurisdiction of a federal court, its resolution predominates any discussion of the merits. *See Steel Co.*, 523 U.S. at 94–95, 118 S.Ct. 1003.

**7.** Since deciding *Atlanta Gas Light Co.*, the Eleventh Circuit has retreated somewhat from that case's determination-which did not consider the holding in *Tennessee Electric*— that private parties have standing to pursue a Tenth Amendment claim. *See Dillard v. Chilton County Comm'n*, 495 F.3d 1324, 1335 (11th Cir.2007) (denying private parties standing to raise a Tenth Amendment claim because they expressed only an "undifferentiated, generalized grievance"); *Seniors Civil Liberties Ass'n v. Kemp*, 965 F.2d 1030, 1034 n. 6 (11th Cir.1992) (applying *Atlanta Gas Light Co.* "with admitted doubts").

the decades since the Supreme Court decided [*Tennessee Electric*]." *Gillespie,* 185 F.3d at 700. It further explained that *New York v. United States,* 505 U.S. 144, 181–82, 112 S.Ct. 2408, 120 L.Ed.2d 120 (1992), cabined the holding of *Tennessee Electric* by establishing that, "in making Tenth Amendment claims, [an individual] actually is asserting his own rights." *Gillespie,* 185 F.3d at 703. The Court based this explanation on the Supreme Court's statement in *New York* that "the Constitution divides authority between federal and state governments for the protection of individuals[,]" 505 U.S. at 181, 112 S.Ct. 2408, which convinced the Seventh Circuit panel that "the Tenth Amendment, although nominally protecting state sovereignty, ultimately secures the rights of individuals." *Gillespie,* 185 F.3d at 703.

Contrary to this reasoning, the five circuit courts to reject independent private party standing for Tenth Amendment claims have focused on the continuing authority of *Tennessee Electric. See, e.g., Oregon,* 552 F.3d at 972; *Brooklyn Legal Servs. Corp.,* 462 F.3d at 234. Noting that the Supreme Court's " 'decisions remain binding precedent until [it] see[s] fit to reconsider them,' " *Hacker,* 565 F.3d at 527 (quoting *Hohn v. United States,* 524 U.S. 236, 252–53, 118 S.Ct. 1969, 141 L.Ed.2d 242 (1998)), these courts have ruled that *Tennessee Electric* denies private plaintiffs standing for Tenth Amendment claims because there exists "no directly contradictory authority from the Supreme Court." *Id.* at 526. The courts also point to varying prudential considerations to support their determinations. *See, e.g., id.* at 527 (suggesting that the holding of *Tennessee Electric* comports with prudential standing principles that generally limit a plaintiff to asserting his own rights); *Medeiros,* 431 F.3d at 36 (hesitating to disregard *Tennessee Electric* because doing so might induce a "substan-

tial increase in ... litigation before the federal courts").

■ We are persuaded by the reasoning advanced by the majority of our sister courts and conclude that a private party lacks standing to claim that the federal Government is impinging on state sovereignty in violation of the Tenth Amendment, absent the involvement of a state or its officers as a party or parties. "If a precedent of [the Supreme] Court has direct application in a case, yet appears to rest on reasons rejected in some other line of decisions, the Court of Appeals should follow the case which directly controls, leaving to [the Supreme] Court the prerogative of overruling its own decisions." *Rodriguez de Quijas v. Shearson,* 490 U.S. 477, 484, 109 S.Ct. 1917, 104 L.Ed.2d 526 (1989). The holding of *Tennessee Electric* thus is binding irrespective of the language in *New York* about federalism's "protection of individuals." *See Medeiros,* 431 F.3d at 34 (noting also that *New York* never actually dealt with the question of standing). Moreover, the fact that the Supreme Court in this decade granted *certiorari* on, but later declined to answer, the question of "whether private plaintiffs have standing to assert 'states' rights' under the Tenth Amendment," *Pierce County, Washington v. Guillen,* 537 U.S. 129, 148 n. 10, 123 S.Ct. 720, 154 L.Ed.2d 610 (2003), does no more than indicate an interest of at least four Justices in *Tennessee Electric*'s binding status.

■ Our interpretation makes it evident that Bond lacks standing to pursue her Tenth Amendment challenge to § 229. The "requisite representation by the states or their officers is notably absent" from her suit, *Brooklyn Legal Servs. Corp.,* 462 F.3d at 234, and she does not even attempt to argue that her interests are aligned with those of a state. *Cf. Parker,* 362 F.3d

at 1284 (speculating that a private party could assert a Tenth Amendment claim by showing that her claim "align[s] with the state's interest"). Accordingly, we will not reach the merits of Bond's arguments concerning the constitutionality of § 229 under our federal system of government.[8]

## 2. Vagueness Claim

The remainder of Bond's constitutional challenge to 18 U.S.C. § 229 presents her claims that the statute is vague and overbroad. She asserts that because "[v]irtually any activity with a chemical ... can cause 'death, temporary incapacitation or permanent harm to humans or animals' ... [, d]efendants in good faith could easily be unsure about what conduct is prohibited" under the statute. Bond's Br. at 28 (quoting 18 U.S.C. § 229F(8)(A)).

■■■■ A statute is unconstitutionally overbroad if it "does not aim specifically at the evils within the allowable area of control by the government, but ... sweeps within its ambit other constitutionally protected activities." *Waterman v. Farmer*, 183 F.3d 208, 212 n. 5 (3d Cir.1999) (internal quotations omitted). "A statute is unconstitutionally vague if 'men of common intelligence must necessarily guess at its meaning and differ as to its application.'" *McAllister v. Att'y Gen.*, 444 F.3d 178, 186 (3d Cir.2006) (quoting *Connally v. Gen. Constr. Co.*, 269 U.S. 385, 391, 46 S.Ct. 126,

70 L.Ed. 322 (1926)). "[O]utside of the First Amendment context, a party has standing to raise a vagueness challenge only if the challenged statute is vague as to that party's conduct." *United States v. Woods*, 915 F.2d 854, 862 (3d Cir.1990).

■■■ Section 229, to repeat, closely adheres to the language of the Chemical Weapons Convention and states, in relevant part:

(a) Unlawful Conduct—Except as provided in subsection (b), it shall be unlawful for any person knowingly—

(1) to develop, produce, otherwise acquire, transfer directly or indirectly, receive, stockpile, retain, own, possess, or use, or threaten to use, any chemical weapon; or

(2) to assist or induce, in any way, any person to violate paragraph (1), or to attempt to conspire to violate paragraph (1).

It further defines a "chemical weapon" as a "toxic chemical and its precursors, except where intended for a purpose not prohibited under this chapter as long as the type and quantity is consistent with such a purpose." *Id.* at § 229F(1)(A).[9] And it describes a "toxic chemical" as "any chemical which through its chemical action on life processes can cause death, tempo-

---

8. Despite Bond's suggestion to the contrary, *see* Bond's Supp. Br. at 4, our conclusion does not bar individuals from any recourse in the face of Tenth Amendment violations accepted by a state. As the First Circuit Court explained, "the State represents the interests of its citizens in general, and, if it refuses to prosecute a viable Tenth Amendment claim, the citizens of that state may have recourse to local political processes to effect change in the state's policy of acquiescence." *Medeiros*, 431 F.3d at 35.

9. "[P]urpose[s] not prohibited under" § 229 include "individual self-defense devices," 18 U.S.C. § 229C, and:
(A) Peaceful purposes. Any peaceful purpose related to an industrial, agricultural, research, medical, or pharmaceutical activity or other activity.
(B) Protected purposes. Any purpose directly related to protection against toxic chemicals and to protection against chemical weapons.
(C) Unrelated military purposes....
(D) Law enforcement purposes....
*Id.* at § 229F.

rary incapacitation or permanent harm to humans or animals." *Id.* at § 299F(8)(A).

While these terms are certainly broad, we conclude that they are neither vague as applied to Bond's actions nor overbroad in their relation to constitutionally protected behavior. *See McAllister,* 444 F.3d at 186. First, there is no doubt that "a person of reasonable intelligence" would know that Bond's conduct violated § 229.[10] Over a period of eight months, Bond researched, stole, and deployed highly toxic chemicals with the intent of harming Haynes. Any one of her attacks could have delivered a lethal chemical dose to Haynes or her then-infant child. Bond's actions thus clearly constituted unlawful possession and use of a chemical weapon under § 229.

■ Second, as even Bond notes, "[t]he statute casts a wide net for obvious reasons." Bond's Br. at 31. Though it potentially criminalizes the harmful use or production of chemicals found in "the cleaning supply aisles at the local grocery store," *id.,* it does not criminalize "protected acitivit[ies] outside the permissible bounds of Congressional regulation." *McAllister,* 444 F.3d at 186. It therefore is not unconstitutionally overbroad.

## B. Validity of Search Warrants

Aside from her constitutional challenge to § 229, Bond seeks to suppress the evidence gathered from her home and vehicle "[b]ecause no probable cause to search [them] existed." Bond's Br. at 33. Bond claims that the affidavit supporting the search warrants "lacked any statement as to why the affiant might have expected the desired evidence to be present at either location," and "provided no basis for the conclusion that [Bond] owned the specified

vehicle or resided at the address provided." *Id.* at 34–35. These claims fail.

■ "To find probable cause to search, there needs to be a 'fair probability that contraband or evidence of a crime will be found in a particular place.'" *United States v. Burton,* 288 F.3d 91, 103 (3d Cir.2002) (quoting *Illinois v. Gates,* 462 U.S. 213, 238, 103 S.Ct. 2317, 76 L.Ed.2d 527 (1983)). To determine this, a court must consider the "totality of the circumstances," *Gates,* 462 U.S. at 238, 103 S.Ct. 2317, and need not conclude that it was "more likely than not" that the evidence sought was at the place described, *see Texas v. Brown,* 460 U.S. 730, 742, 103 S.Ct. 1535, 75 L.Ed.2d 502 (1983). We have explained that "[d]irect evidence linking the place to be searched to the crime is not required for the issuance of a search warrant." *United States v. Hodge,* 246 F.3d 301, 305 (3d Cir.2001). This is because "probable cause can be, and often is, inferred by considering the type of crime, the nature of the items sought, the suspect's opportunity for concealment and normal inferences about where a criminal might hide the fruits of his crime." *Id.*

■ In this case, Postal Inspectors described the following evidence to support search warrants for Bond's home and car: (1) the threats made by Bond to Haynes; (2) video coverage showing Bond stealing Haynes's mail, "placing a red powdery substance on the inside of . . . Haynes's car muffler," and "going back and forth several times between her own car and . . . Haynes's car"; (3) Bond's duties at Rohm and Haas and the report of the chemicals missing from its storage area; (4) Haynes's identification of Bond;

---

**10.** Because Bond understandably does not claim that her chemical attacks on Haynes were expressive activities protected by the First Amendment, her vagueness challenge can succeed only if the statute is vague in its application to her specific conduct. *See United States v. Powell,* 423 U.S. 87, 92, 96 S.Ct. 316, 46 L.Ed.2d 228 (1975).

(5) the inspectors' determination "that Carol Ann Bond is the owner of the 2007 Saturn Ion silver or grey 4 Door Sedan"; and (6) the specific location of Bond's home. App. at 29–31. This represented "an accumulation of circumstantial evidence that together indicates a fair probability of the presence of contraband at the home [and vehicle] of the arrested." *Burton*, 288 F.3d at 103.[11]

In sum, because "the Government proffered sufficient evidence in the ... affidavit that there was a 'fair probability that contraband' would be found [in Bond's home and car], the warrant[s] [were] validly sought and approved, and we will not suppress the evidence that resulted from the search of that property." *Id.* at 105 (quoting *Gates*, 462 U.S. at 238, 103 S.Ct. 2317).

## C. Appropriateness of "Special Skill" Sentence Enhancement

Bond's final challenge to the District Court's order concerns her two-level sentence enhancement under U.S.S.G. § 3B1.3 for using a special skill to facilitate the commission of a crime. She claims that this enhancement "reflects a misapplication of the sentencing guidelines and constituted clear error by the sentencing court." Bond's Br. at 40. We disagree.

■■■ Section 3B1.3 of the Sentencing Guidelines provides for a two-level enhancement where "the defendant ... used a special skill ... in a manner that significantly facilitated the commission or concealment of the offense." "The purpose of this section is to add to the punishment of those who turn legitimate special skills to the perpetration of evil deeds." *United States v. Mainard*, 5 F.3d 404, 406 (9th Cir.1993); *see also United States v. Young*, 932 F.2d 1510, 1513 (D.C.Cir.1991). Thus, a sentencing court is required to make two findings before imposing an upward adjustment for use of a special skill: "(1) the defendant possesses a special skill; and (2) ... used it to significantly facilitate the commission or concealment of the offense." *United States v. Batista De La Cruz*, 460 F.3d 466, 468 (3d Cir.2006).

■■■ The application note to § 3B1.3 defines "special skill" as "a skill not possessed by members of the general public and usually requiring substantial education, training, or licensing." It further states that examples of individuals with special skills "include pilots, lawyers, doctors, accountants, chemists, and demolition experts." U.S.S.G. § 3B1.3 app. n. 4. "[A] § 3B1.3 sentence enhancement," however, "is not limited to persons who have received substantial formal education, training from experts, or who have been licensed to perform a special skill." *United States v. Urban*, 140 F.3d 229, 236 (3d Cir.1998).

■■■ Bond argues that, despite her advanced degree in microbiology, she does not possess a special skill because she merely "was a low level technical analyst" at Rohm and Haas who "did not even use the two chemicals charged in the indictment." She emphasizes that "95% of the

---

11. Bond's possession and use of significant quantities of toxic chemicals additionally gave rise to probable cause that she was keeping them in her home. *Cf. Hodge*, 246 F.3d at 306 ("It is reasonable to infer that a person involved in drug dealing ... would store evidence of that dealing at his home."); *United States v. Whitner*, 219 F.3d 289, 297 (3d Cir. 2000) ("[E]vidence associated with drug dealing needs to be stored somewhere, and ... a dealer will have the opportunity to conceal it in his home. After all, a dealer logically could conclude that his residence is the best, and probably the only, location to store ... large quantities of drugs....").

20,000 chemicals [at Rohm and Haas] were listed on the company's computer where any employee could search the chemical by name, see where it was located, and 'go and borrow it.'" And she asserts that all Rohm and Haas employees "receive[d] safety training and learn[ed] how to read Material Safety Data Sheets ... [,] which are published for all chemicals available in the United States." Bond's Br. at 45.

These contentions fall far short of persuasive. With her degree and work experience, Bond has skills and knowledge "not possessed by members of the general public and usually requiring substantial education, training, or licensing." U.S.S.G. § 3B1.3 app. n. 4. She is specifically trained in the development and application of biocides, which are defined as "poisonous chemical substance[s] that can kill living organisms." Webster's New World Dictionary 75 (1966). She also is competent in working with chemicals and researching them according to their labeled qualities. Taken together, these attributes constitute a "special skill" for purposes of U.S.S.G. § 3B1.3.

■■■■ With regard to the second prong of the special skill enhancement test, use of a special skill "in a manner that significantly facilitate[s] the commission or concealment of the offense" is proven by "a *direct* use of the special skill." *United States v. Hickman*, 991 F.2d 1110, 1113 (3d Cir.1993) (emphasis in original). The First Circuit Court, for instance, held that a repairman of bank machines directly used his special skill when he caused the machines to malfunction in order to rob them. *See United States v. Aubin*, 961 F.2d 980, 984 (1st Cir.1992). Even more pertinent, the Seventh Circuit Court held that a lab technician with a background in biology who ran a methamphetamine lab directly used his special skill in the commission of a crime. *See United States v. Fairchild*, 940 F.2d 261, 263–66 (7th Cir.1991). The Court explained that the lab technician specifically had "used his knowledge of chemistry to purchase chemicals for his company, and put them together in the 'right combination' ... to make methamphetamine." *Id.* at 266.

■■■ Applying similar logic to Bond, it is apparent that she employed her special skill to select the unusually toxic chemicals she used against Haynes. In particular, her training and position allowed her to research and steal chemicals that were more toxic via topical exposure than ingestion. It also facilitated her handling and deployment of the chemicals. Additionally, it is unquestionable that Bond's special skill influenced her decision to use toxic chemicals as her weapon of revenge. Poisoning one's rivals, of course, is nothing new. But attempting to do so through the systematic application of 10–chloro–10H–phenoxarsine is not an approach typically taken by members of the general public. Rather, as the District Court concluded, it reflects the plan and actions of an individual trained in the use of biocidal chemicals.

The District Court accordingly did not err in assigning Bond a two-level sentence enhancement for using a special skill "in a manner that significantly facilitated the commission or concealment of the offense." U.S.S.G. § 3B1.3. Bond's education and training constitute a special skill, and she directly used that skill committing her crime.

## IV. Conclusion

Bond fell within the ambit of the federal chemical weapons statute by strategically employing toxic chemicals with the intent to harm Haynes. As a private party acting independently of a state, she lacks standing to challenge the constitutionality of this statute on the basis of the Tenth Amendment, and her claims that the stat-

ute is vague and overbroad fall short of the mark. Moreover, law enforcement personnel legally obtained the evidence that led to her indictment, and the special skill sentence enhancement that the District Court applied to Bond appropriately punished her offenses. For these reasons, we affirm the judgment of the District Court.