PRECEDENTIAL
UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT
_____

No. 08-2677
_____

UNITED STATES OF AMERICA

v.

CAROL ANNE BOND,
                              Appellant
_____

On Appeal from the United States District Court
for the Eastern District of Pennsylvania
(D.C. No. 07-cr-528)
District Judge: Honorable James T. Giles
_____

Argued
November 16, 2011
On Remand From the United States Supreme Court

Before:   RENDELL, AMBRO, and JORDAN, *Circuit
Judges*.

(Filed: May 3, 2012)
_____

1

Paul D. Clement   [ARGUED]
Bancroft
1919 M Street, NW - #470
Washington, DC  20036

Adam M. Conrad
King & Spalding
100 N. Tryon Street - #3900
Charlotte, NC  28202

Robert E. Goldman
P.O. Box 239
Fountainville, PA   18923

Ashley C. Parrish
King & Spalding
1700 Pennsylvania Avenue, NW - #200
Washington, DC  20006

Eric E. Reed
Fox Rothschild
2000 Market Street – 20th Fl.
Philadelphia, PA  19103
        *Counsel for Appellant*

Paul G. Shapiro   [ARGUED]
Office of United States Attorney
615 Chestnut Street - #1250
Philadelphia, PA  19106
        *Counsel for Appellee*

_____

_____

OPINION OF THE COURT
_____

JORDAN, *Circuit Judge*.

This case is before us on remand from the Supreme Court, which vacated our earlier judgment that Appellant Carol Anne Bond lacked standing to challenge, on Tenth Amendment grounds, her conviction under the penal provision of the Chemical Weapons Convention Implementation Act of 1998, 18 U.S.C. § 229 (the "Act"), which implements the 1993 Chemical Weapons Convention, 32 I.L.M. 800 (1993) (the "Convention"). The Supreme Court determined that Bond does have standing to advance that challenge, and returned the case to us to consider her constitutional argument.

In her merits argument, Bond urges us to set aside as inapplicable the landmark decision *Missouri v. Holland*, 252 U.S. 416 (1920), which is sometimes cited for the proposition that the Tenth Amendment has no bearing on Congress's ability to legislate in furtherance of the Treaty Power in Article II, § 2 of the Constitution. Cognizant of the widening scope of issues taken up in international agreements, as well as the renewed vigor with which principles of federalism have been employed by the Supreme Court in scrutinizing assertions of federal authority, we agree with Bond that treaty-implementing legislation ought not, by virtue of that status alone, stand immune from scrutiny under principles of federalism. However, because the Convention is an international agreement with a subject matter that lies at the

3

core of the Treaty Power and because *Holland* instructs that "there can be no dispute about the validity of [a] statute" that implements a valid treaty, 252 U.S. at 432, we will affirm Bond's conviction.

## I. Factual Background and Procedural History

### A. *Facts*

Bond's criminal acts are detailed in our prior opinion, *United States v. Bond*, 581 F.3d 128, 131-33 (3d Cir. 2009) ("*Bond I*"), and in the Supreme Court's opinion, *Bond v. United States*, 131 S. Ct. 2355, 2360-61 (2011) ("*Bond II*"), so we provide only a brief recitation here. Suffice it to say that, while Bond was employed by the chemical manufacturer Rohm and Haas, she learned that her friend Myrlinda Hanes was pregnant and that Bond's own husband was the baby's father. Bond became intent on revenge. To that end, she set about acquiring highly toxic chemicals, stealing 10-chlorophenoxarsine from her employer and purchasing potassium dichromate over the Internet. She then applied those chemicals to Hanes's mailbox, car door handles, and house doorknob. Bond's poisonous activities were eventually discovered and she was indicted on two counts of acquiring, transferring, receiving, retaining, or possessing a chemical weapon, in violation of the Act. She was, in addition, charged with two counts of theft of mail matter, in violation of 18 U.S.C. § 1708.

### B. *Procedural History*

Bond filed a motion to dismiss the counts that alleged violations of the Act. She argued that the Act was

4

unconstitutional, both facially and as applied to her. More particularly, she said that the Act violated constitutional "fair notice" requirements, that it was inconsistent with the Convention it was meant to implement, and that it represented a breach of the Tenth Amendment's protection of state sovereignty. Emphasizing that last point, Bond contended that neither the Commerce Clause, nor the Necessary and Proper Clause in connection with the Treaty Power, could support the expansive wording of the statute, let alone her prosecution. (*See* App. at 59 (arguing that, "[g]iven the localized … scope of the conduct alleged, … application of 18 U.S.C. § 229 signals a massive and unjustifiable expansion of federal law enforcement into state-regulated domain").) The government's response has shifted over time,[1] but it has been consistent in maintaining that the Act is a constitutional

---

[1] The government has, at different stages of this case, been willing to jettison one legal position and adopt a different one, as seemed convenient. Before the District Court, it expressly disclaimed the Commerce Clause as a basis for Congress's power to approve the Act. (*See* E.D. Pa. No. 07-cr-528, doc. no. 30, at 7 ("Title 18, United States Code, Section 229 was not enacted under the interstate commerce authority but under Congress's authority to implement treaties.").) The government still maintained that position the first time it appeared before us, relying only on the Necessary and Proper Clause in support of the Act's constitutionality. (*See* Appellee's Initial Br. at 20-32.) Once before the Supreme Court, however, the government decided that this is really a Commerce Clause case and that the position it had pressed before us is secondary. That change was in addition to abandoning the position on standing that it had previously taken. *See infra* note 2.

exercise of Congress's authority to enact treaty-implementing legislation under the Necessary and Proper Clause. The District Court accepted that argument and denied Bond's motion to dismiss.

We affirmed on appeal, concluding that Bond lacked standing to pursue her Tenth Amendment challenge and that the Act was neither unconstitutionally vague nor unconstitutionally overbroad.[2] *Bond I*, 581 F.3d at 139. The Supreme Court granted certiorari to address the question of "[w]hether a criminal defendant convicted under a federal statute has standing to challenge her conviction on grounds that, as applied to her, the statute is beyond the federal

---

[2] We determined that Bond lacked standing to pursue her Tenth Amendment challenge after requesting supplemental briefing on the question of whether she "ha[d] standing to assert that 18 U.S.C. § 229 encroaches on state sovereignty in violation of the Tenth Amendment to the United States Constitution absent the involvement of a state or its instrumentalities[.]" (*United States v. Bond*, No. 08-2677, 08/14/2009 Letter to Counsel.) The government responded that Bond lacked such standing under *Tennessee Electric Power Co. v. Tennessee Valley Authority*, 306 U.S. 118 (1939), which held that "appellants, absent the states or their officers, have no standing … to raise any question under the [Tenth] [A]mendment," *id*. at 144. (*United States v. Bond*, No. 08-2677, 08/20/2009 Letter from Appellee.) Before the Supreme Court, however, the government reversed course and argued that Bond did have standing to make a Tenth Amendment challenge. *See Bond II*, 131 S. Ct. at 2361 (describing the government's initial "position that Bond did not have standing" and the changed position before the Supreme Court that "Bond does have standing").

government's enumerated powers and inconsistent with the Tenth Amendment." Petition for Writ of Certiorari, *Bond v. United States* (No. 09-1227), 2010 WL 1506717 at *i; *see Bond v. United States*, 131 S. Ct. 455 (2010). Ultimately, the Court concluded that Bond "does have standing to challenge the federal statute." *Bond II*, 131 S. Ct. at 2360. The case was remanded to us to address the "issue of the statute's validity" which, as the Court instructed, "turns in part on whether the law can be deemed 'necessary and proper for carrying into Execution' the President's Article II, § 2 Treaty Power." *Id*. at 2367 (quoting U.S. Const. art. I, § 8, cl. 18).

## II.  Discussion[3]

In *Missouri v. Holland*, the Supreme Court declared that, if a treaty is valid, "there can be no dispute about the validity of the statute [implementing it] under Article 1, Section 8, as a necessary and proper means to execute the powers of the Government."[4]  252 U.S. at 432. Implicit in

---

[3] The District Court had jurisdiction under 18 U.S.C. § 3231. We have jurisdiction under 28 U.S.C. § 1291 and 18 U.S.C. § 3742, and review *de novo* a challenge to the constitutionality of a criminal statute, *Bond I*, 581 F.3d at 133.

[4] The referenced section of the Constitution is the Necessary and Proper Clause, which provides Congress with the power "[t]o make all Laws which shall be necessary and proper for carrying into Execution the foregoing Powers, and all other Powers vested by this Constitution in the Government of the United States, or in any Department or Officer thereof." U.S. Const. art. I, § 8, cl. 18.

7

that statement is the premise that principles of federalism will ordinarily impose no limitation on Congress's ability to write laws supporting treaties, because the only relevant question is whether the underlying treaty is valid. *See id.* at 432, 434 (stating that "it is not enough to refer to the Tenth Amendment, reserving the powers not delegated to the United States" because the Treaty Power is delegated, but acknowledging the possibility that there may sometimes be "invisible radiation[s] from the general terms of the Tenth Amendment"). Reasoning that a reading of *Holland* that categorically rejects federalism as a check on Congress's treaty-implementing authority is of questionable constitutional validity, Bond asks us to invalidate her conviction because the Act is unconstitutional as applied to her.[5] She says that to hold otherwise would offend the

---

[5] It appears that Bond has abandoned her facial challenge to the Act. Her argument, both in her supplemental briefing before us and at oral argument, is articulated as an as-applied challenge. (*See, e.g.*, Appellant's Supp. Br. at 26 ("Bond is raising a … limited and narrowly focused as-applied challenge. She contends that, whatever its validity more generally, the statute cannot be constitutionally applied to her in the circumstances of this case."); Transcript of Oral Argument at 11-13, *United States v. Bond*, No. 08-2677 ("3d Cir. Argument").) And, Bond's counsel commented at oral argument that he was "trying ... [to be] respectful of the Supreme Court's jurisprudence that says you don't lightly bring a facial challenge" to a statute. (3d Cir. Argument at 62.) Counsel framed his argument as being that "the principle[] that [the statute has] offended is that if you apply it so broadly that it criminalizes every malicious use of poisoning, then you've overridden the structural limitations

Constitution's balance of power between state and federal authority by "intrud[ing] … on the traditional state prerogative to punish assaults." (Appellant's Supp. Br. at 47.)

### A. *Constitutional Avoidance*

Bond first argues, however, that we should avoid reaching the constitutional question by construing the Act not to apply to her conduct at all.[6]

Her avoidance argument begins with the text of the Act itself, which provides, in pertinent part, that "it shall be unlawful for any person knowingly … to develop, produce,

---

on the government and the division of power between the federal government and the states." (*Id*. at 15-16.) We thus take it as granted that, although some of her past arguments move into the territory of a facial challenge, Bond is not now saying that Congress was without power to pass the Act but is, instead, arguing that Congress could not properly pass it if the Act's language is interpreted in a way that reaches her conduct. In short, we are dealing with an as-applied, rather than a facial, challenge.

[6] Bond's constitutional avoidance argument necessarily presumes a serious constitutional problem, notwithstanding *Holland*. *See Edward J. DeBartolo Corp. v. Fla. Gulf Coast Bldg. & Constr. Trades Council*, 485 U.S. 568, 575 (1988) (stating the constitutional avoidance inquiry should be undertaken in the face of "serious constitutional problems"). Regardless of *Holland*'s breadth, we accept Bond's suggestion that it is prudent to begin our analysis with the avoidance doctrine.

otherwise acquire, transfer directly or indirectly, receive, stockpile, retain, own, possess, or use, or threaten to use, any chemical weapon." 18 U.S.C. § 229(a)(1). The term "chemical weapon" is defined broadly to include any "toxic chemical and its precursors," *id.* § 229F(1)(A), and "[t]he term 'toxic chemical' means any chemical which through its chemical action on life processes can cause death, temporary incapacitation or permanent harm to humans or animals," *id.* § 229F(8)(A). Congress did put some limit on the sweep of the Act by excluding from the definition of "chemical weapon" any chemicals and precursors "intended for a purpose not prohibited under this chapter as long as the type and quantity is consistent with such a purpose." *Id.* § 229F(1)(A). The phrase "purpose not prohibited under this chapter," is then defined, in part, as "[a]ny peaceful purpose related to an industrial, agricultural, research, medical, or pharmaceutical activity or other activity." *Id.* § 229F(7)(A). It is that "peaceful purpose" language that Bond urges us to take as our interpretive lodestar.

Specifically, Bond argues that, by looking to the "peaceful purpose" exception, we can employ a "common sense interpretation of § 229" that avoids "mak[ing] every malicious use of a household chemical" – including her own – a federal offense. (Appellant's Supp. Br. at 17.) All we need do is "interpret the statute … to reach [only the kind of acts] that would violate the Convention if undertaken by a signatory state." (*Id.* at 14.) In other words, as Bond sees it, the modifier "peaceful" should be understood in contradistinction to "warlike" (3d Cir. Argument at 23), and, when so understood, the statute will not reach "conduct that no signatory state could possibly engage in – such as using chemicals in an effort to poison a romantic rival," as Bond

10

did. (Appellant's Supp. Br. at 40.) That interpretation is tempting, in light of the challenges inherent in the Act's remarkably broad language,[7] but, as we held the first time we had this case, Bond's behavior "clearly constituted unlawful possession and use of a chemical weapon under § 229." *Bond I*, 581 F.3d at 139.

That holding is in better keeping with the Act's use of the term "peaceful purpose" than the construction Bond would have us give it. The ordinary meaning of "peaceful" is

---

[7] The Act's breadth is certainly striking, seeing as it turns each kitchen cupboard and cleaning cabinet in America into a potential chemical weapons cache. *Cf.* Transcript of Oral Argument at 29, *Bond v. United States*, 131 S. Ct. 2355 (2011) (No. 09-1227) (Justice Alito's statement during oral argument that "pouring a bottle of vinegar in [a] friend's goldfish bowl" could constitute the use of a chemical weapon under the Act and expose a person to years in federal prison). We observed as much the last time this case was before us, noting, as Bond had herself acknowledged at the time, that the Act's wide net was cast "for obvious reasons." *Bond I*, 581 F.3d at 139. Ultimately, however, we concluded that the Act was not unconstitutionally overbroad. *See id.* (observing that the Act is "certainly broad," but not unconstitutionally so). Bond did not challenge that determination, s*ee* Petition for Writ of Certiorari, *Bond v. United States* (No. 09-1227), 2010 WL 1506717 at *i, and it remains undisturbed. That the Act is not unconstitutionally overbroad, of course, does not preclude Bond from arguing, as she now does, that the Act offends the Constitution's division of power between the federal government and the states to the extent it is used to make her conduct a federal crime.

11

"untroubled by conflict, agitation, or commotion," "of or relating to a state or time of peace," or "devoid of violence or force," *Merriam-Webster's Collegiate Dictionary* 852 (10th ed. 2002), and Bond's "deploy[ment of] highly toxic chemicals with the intent of harming Haynes," *Bond I*, 581 F.3d at 139, can hardly be characterized as "peaceful" under that word's commonly understood meaning, *cf. Jones v. United States*, 529 U.S. 848, 857-58 (2000) (interpreting the federal arson statute not to reach "traditionally local criminal conduct" since the statute was "susceptible of two constructions" (citation and internal quotation marks omitted)). The term "peaceful," moreover, does not appear in isolation: the Act only excludes from its ambit "peaceful purpose[s] … related to *an industrial, agricultural, research, medical, or pharmaceutical activity or other activity*." 18 U.S.C. § 229F(7)(A) (emphasis added). Bond's attacks on Haynes – even if non-warlike – were certainly not "related to an industrial, agricultural, research, medical, or pharmaceutical activity." *Id*. Nor can her use of chemicals be said to be a "peaceful purpose[] … related to an … other activity," because regarding her assaultive behavior as such would improperly expand § 229F(7)(A)'s scope. *See, e.g.*, *Gooch v. United States*, 297 U.S. 124, 129 (1936) ("The rule of ejusdem generis … [o]rdinarily … limits general terms which follow specific ones to matters similar to those specified.").

Thus, while one may well question whether Congress envisioned the Act being applied in a case like this, the language itself does cover Bond's criminal conduct. And, given the clarity of the statute, we cannot avoid the constitutional question presented. *See United States v. Stevens*, 130 S. Ct. 1577, 1591 (2010) (stating that only

12

"'ambiguous statutory language [should] be construed to avoid serious constitutional doubts'" (alteration in original) (citation omitted)); *United States v. Locke*, 471 U.S. 84, 96 (1985) ("We cannot press statutory construction 'to the point of disingenuous evasion' even to avoid a constitutional question." (quoting *George Moore Ice Cream Co. v. Rose*, 289 U.S. 373, 379 (1933))).   It is not our prerogative to rewrite a statute, and we see no sound basis on which we can accept Bond's construction of the Act without usurping Congress's legislative role.   Though we agree it would be better, if possible, to apply a limiting construction to the Act rather than consider Bond's argument that it is unconstitutional, *see Burton v. United States*, 196 U.S. 283, 295 (1905) ("It is not the habit of the court to decide questions of a constitutional nature unless absolutely necessary to a decision of the case"), the statute speaks with sufficient certainty that we feel compelled to consider the hard question presented in this appeal.

B.     *Constitutionality of the Act as Applied*

Understanding whether application of the Act to Bond violates the structural limits of federalism begins with the Tenth Amendment, which Bond cites and which provides that "[t]he powers not delegated to the United States by the Constitution, nor prohibited by it to the States, are reserved to the States respectively, or to the people."  U.S. Const. amend. X.  That text, as the Supreme Court has observed, "confirms that the power of the Federal Government is subject to limits that may … reserve power to the States."  *New York v. United States*, 505 U.S. 144, 157 (1992).  Thus, it encapsulates the principles of federalism upon which our nation was founded. *See* D.A. Jeremy Telman, *A Truism That Isn't True? The*

*Tenth Amendment and Executive War Power*, 51 Cath. U. L. Rev. 135, 143-44 (2001) (describing the argument that "the Tenth Amendment has a declaratory function and provides a rule of constitutional interpretation rather than a rule of constitutional law").[8]

---

[8] We do not need to determine whether the Tenth Amendment is a tautology reflecting the structural limitations on federal power embodied in the system of dual sovereignty established by the Constitution, or, as has sometimes been suggested, serves as an independent check on federal power. *See New York*, 505 U.S. at 156, 160 (describing the argument that, even when Congress has the authority to regulate, "the Tenth Amendment limits the power of Congress to regulate in the way it has chosen," though noting that its actual limit "is not derived from the text" of the Tenth Amendment as the Tenth Amendment is "essentially a tautology"); *Nat'l League of Cities v. Usery*, 426 U.S. 833, 842 (1976) (recognizing a "limit[] upon the power of Congress to override state sovereignty, even when exercising its otherwise plenary powers … which are conferred by Art. I of the Constitution" and that "an express declaration of this limitation is found in the Tenth Amendment"), *overruled by Garcia v. San Antonio Metro. Transit Auth.*, 469 U.S. 528 (1985); *cf.* Gerard N. Magliocca, *A New Approach to Congressional Power: Revisiting the Legal Tender Cases*, 95 Geo. L.J. 119, 125 n.30 (2006) (suggesting the Tenth Amendment's "independent force" is limited to "[l]aws that regulate states *qua* states"). Regardless of whether the Tenth Amendment has "independent force of its own," *Bond II*, 131 S. Ct. at 2367, we understand our constitutional inquiry to turn on whether principles of federalism are violated by the Act, in light of the Constitution's delegation to the President of the power "to

Endeavoring to discover what impact the Tenth Amendment may have on treaty-implementing legislation immediately leads, as we have indicated, to the Supreme Court's decision in *Missouri v. Holland*. The statute at issue in that case, the Migratory Bird Treaty Act, 16 U.S.C. § 703, implemented a treaty between the United States and Great Britain that banned the hunting of migratory birds during certain seasons. *Holland*, 252 U.S. at 431. The State of Missouri brought suit against a U.S. game warden, arguing that the statute unconstitutionally interfered with the rights reserved to Missouri by the Tenth Amendment because Missouri was free to do what it wished with the birds while they were within its borders. *Id*. at 431-32. The Supreme Court, speaking through Justice Holmes, rejected that argument, reasoning that "it is not enough to refer to the Tenth Amendment, reserving the powers not delegated to the United States, because by Article 2, Section 2, the power to make treaties is delegated expressly." *Id.* at 432.

As noted earlier, the Court made it clear that Congress may, under the Necessary and Proper Clause, legislate to implement a valid treaty, regardless of whether Congress would otherwise have the power to act or whether the legislation causes an intrusion into what would otherwise be within the state's traditional province. *Id.* at 432-33. While

make Treaties, provided two thirds of the Senators present concur," U.S. Const. art. II, § 2, cl. 2, and to Congress of the power to enact "all Laws which shall be necessary and proper for carrying into Execution … all other Powers vested by th[e] Constitution in the Government of the United States, or in any Department or Officer thereof," U.S. Const. art. I, § 8, cl. 18.

15

the Court did allow that there may be "qualifications to the treaty-making power," it also said, somewhat obscurely, that they had to be found "in a different way" than one might find limitations on other grants of power to the federal government. *Id*. at 433. After implying that Congress's powers are particularly sweeping when dealing with "matters requiring national action," the Court suggested one limitation on the Treaty Power: if the implementation of a treaty "contravene[s] any prohibitory words to be found in the Constitution," then it may be unconstitutional. *Id.* (citation omitted). Since the treaty in question did not do that, the only remaining question was "whether it [was] forbidden by some invisible radiation from the general terms of the Tenth Amendment." *Id*. at 433-34. The Court concluded that it was not. *See id.* (reasoning that, while "the great body of private relations usually fall within the control of the State, ... a treaty may override its power"). Finally, the Court assumed without further discussion that, because the treaty was valid, so was the implementing statute. *See id.* at 435 ("We see nothing in the Constitution that compels the Government to sit by while a food supply is cut off and the protectors of our forests and our crops are destroyed.").

In sum, *Holland* teaches that, when there is a valid treaty, Congress has authority to enact implementing legislation under the Necessary and Proper Clause, even if it might otherwise lack the ability to legislate in the domain in question.[9] *See United States v. Lara*, 541 U.S. 193, 201

---

[9] It has been argued that *Holland* incorrectly permits "treaties … [to] expand the legislative power of Congress." Nicholas Quinn Rosenkranz, *Executing The Treaty Power*, 118 Harv. L. Rev. 1867, 1875 (2005). The Cato Institute has

16

(2004) ("[A]s Justice Holmes pointed out [in *Holland*], treaties made pursuant to [the Treaty Power] can authorize Congress to deal with 'matters' with which otherwise 'Congress could not deal.'" (quoting *Holland*, 252 U.S. at 433)). The legislation must, of course, meet the Necessary and Proper Clause's general requirement that legislation implemented under that Clause be "rationally related to the implementation of a constitutionally enumerated power." *United States v. Comstock*, 130 S. Ct. 1949, 1956 (2010); *see also McCulloch v. Maryland*, 17 U.S. (4 Wheat.) 316, 421 (1819) ("[A]ll means which are appropriate, which are plainly adapted to that end, which are not prohibited, but consist with the letter and spirit of the constitution, are constitutional.").

---

submitted an amicus brief taking that position, arguing against *Holland*'s "impl[ication] that if a treaty commits the United States to enact some legislation, then Congress automatically obtains the power to enact that legislation, even if it would lack such power in the absence of the treaty." (Amicus Br. at 6.) Amicus argues that Congress's authority to act in connection with the Treaty Power only permits it to enact those laws that are necessary and proper to permit the President to make treaties – not to implement treaties once they are agreed upon. (*See id.* (arguing the President cannot increase Congress's power under the Necessary and Proper Clause by entering into a treaty).) Under that view, Congress could, for example, legislate to provide funding for an office of treaty-making, but could not have implemented the broadly worded Convention involved here. (*See id.* at 8 ("[T]his power would … embrace any … laws necessary and proper to ensuring the wise use of the power to enter treaties.").) *Holland* remains binding precedent, however, and forecloses this line of reasoning.

In the treaty context, that requirement has been understood to mean that a treaty and its implementing legislation must be rationally related to one another. *United States v. Ferreira*, 275 F.3d 1020, 1027 (11th Cir. 2001). Thus, as long as "the effectuating legislation bear[s] a rational relationship to" a valid treaty, *United States v. Lue*, 134 F.3d 79, 84 (2d Cir. 1998), the arguable consequence of *Holland* is that treaties and associated legislation are simply not subject to Tenth Amendment scrutiny, no matter how far into the realm of states' rights the President and Congress may choose to venture. *See* Curtis A. Bradley, *The Treaty Power and American Federalism*, 97 Mich. L. Rev. 390, 395 (1998) (taking exception with *Holland* to the extent it can be read to say that "the treaty power is immune from federalism restrictions because that power has been exclusively delegated to the federal government"); Erwin Chemerinsky, *Constitutional Law: Principles and Policies* 287 (4th ed. 2011) (stating that the *Holland* court "rejected the claim that state sovereignty and the Tenth Amendment limit the scope of the treaty power"); Louis Henkin, *Foreign Affairs and the U.S. Constitution* 191 (2nd ed. 1996) ("What [*Holland*] said, simply, was that the Constitution delegated powers to various branches of the federal government, not only to Congress; the Treaty Power was delegated to the federal treaty-makers, a delegation additional to and independent of the delegations to Congress. Since the Treaty Power was delegated to the federal government, whatever is within its scope is not reserved to the states: the Tenth Amendment is not material." (internal footnote omitted)). *But see* David M. Golove, *Treaty-Making and the Nation: The Historical Foundations of the Nationalist Conception of the Treaty Power*, 98 Mich. L. Rev. 1075, 1085 (2000) (noting that "treaties are not immune from federalism limitations, and nothing in [*Holland*]

18

suggests the contrary," but acknowledging that "it is difficult to imagine realistic scenarios in which treaty stipulations would violate [the applicable] limitations").

Bond vigorously disputes the implications of that conclusion. Specifically, she argues that legal trends since the Supreme Court's 1920 decision in *Holland* make it clear that the Tenth Amendment should not be treated as irrelevant when examining the validity of treaty-implementing legislation. (*See* Appellant's Supp. Br. at 24 ("[I]n recent decades, the Supreme Court has reasserted the critical role of the Tenth Amendment in preserving the proper balance of authority between federal and state government to ensure that all levels of government represent and remain accountable to the People.").) Concluding otherwise, she asserts, would make "nothing … off-limits" in a world where, more and more, "international treaties govern[] a virtually unlimited range of subjects and intrud[e] deeply on internal concerns." (*See id.* at 20.) That latter point is not without merit. Juxtaposed against increasingly broad conceptions of the Treaty Power's scope, reading *Holland* to confer on Congress an unfettered ability to effectuate what would now be considered by some to be valid exercises of the Treaty Power runs a significant risk of disrupting the delicate balance between state and federal authority.[10]

---

[10] The Supreme Court has focused renewed attention on federalism over the last two decades. Although many earlier cases reflect the importance of the our Constitution's basic provision for dual sovereigns, *see, e.g.*, *Gregory v. Ashcroft*, 501 U.S. 452, 460 (1991) (observing that the rule requiring Congress to speak clearly in order to preempt state law "acknowledg[es] that the States retain substantial

sovereign powers under our constitutional scheme"); *South Dakota v. Dole*, 483 U.S. 203, 211-12 (1987) (recognizing that Congress may not coerce the states when exercising its power to spend), more recent cases have been particularly pointed in describing the role federalism principles should play in analyzing assertions of federal authority. That trend began at least as early as the Court's decision in *New York v. United States*, 505 U.S. 144 (1992), which held that the federal government could not "commandeer[] the legislative processes of the States." *Id.* at 176 (citation and internal quotation marks omitted). After *New York*, the Court struck down legislation criminalizing local conduct in *United States v. Lopez*, 514 U.S. 549 (1995), as beyond the Commerce Clause Power. In doing so the Court recognized the importance of the states' authority to "defin[e] and enforc[e] the criminal law," and noted that, "[w]hen Congress criminalizes conduct already denounced as criminal by the States, it effects a change in the sensitive relation between federal and state criminal jurisdiction." *Id.* at 561 n.3 (citations and internal quotation marks omitted). In *Printz v. United States*, 521 U.S. 898, 919 (1997), the Court likewise considered principles of federalism in striking down legislation that required state police to perform background checks on potential gun owners. *See id.* at 19 (noting the establishment of dual sovereignties was "reflected throughout the Constitution's text," and had vested in the states "'a residuary and inviolable sovereignty.'" (quoting The Federalist No. 39 (James Madison))). Similarly, in *United States v. Morrison*, 529 U.S. 598 (2000), the Court struck down legislation making it a federal offense to commit a crime of violence motivated by gender, observing that "[t]he Constitution requires a distinction between what is truly

Those concerns notwithstanding, Bond does not argue that the Convention itself is constitutionally infirm. On the contrary, she admits "that a treaty restricting chemical weapons is a 'proper subject[] of negotiations between our government and other nations.'" (*Id.* at 4-5 (alteration in original) (citation omitted)). Accordingly, we need not tackle, head on, whether an arguably invalid treaty has led to legislation encroaching on matters traditionally left to the police powers of the states. Nevertheless, resolving the argument Bond does lodge against her prosecution requires at least some consideration of whether the Convention is, in fact, valid. *See Holland*, 252 U.S. at 432 ("*If the treaty is valid* there can be no dispute about the validity of the statute … ." (emphasis added)). We therefore turn briefly to whether the Convention falls within the Treaty Power's appropriate scope, bearing in mind that Bond seems to accept that it does.

### 1. *The Convention's Validity*

The Constitution does not have within it any explicit subject matter limitation on the power granted in Article II, § 2. That section states simply that the President has the "Power, by and with the Advice and Consent of the Senate, to make Treaties, provided two thirds of the Senators present concur." U.S. Const. art. II, § 2, cl. 2. Throughout much of American history, however, including when *Holland* was handed down, it was understood that the Treaty Power was

national and what is truly local," *id.* at 617-18, and that there was "no better example of the police power, which the Founders denied the National Government and reposed in the States, than the suppression of violent crime and vindication of its victims," *id.* at 618.

21

impliedly limited to certain subject matters. *See* Bradley, *supra*, at 429 (arguing that "a subject matter limitation [on the Treaty Power] appears to have been assumed both during the Founding and at times during the nineteenth century," and suggesting it was likewise assumed by the *Holland* court); Golove, *supra*, at 1288 ("[V]irtually every authority, including the Supreme Court, has on countless occasions from the earliest days recognized general subject matter limitations on treaties.").

Contemporaneous records such as the Virginia Ratifying Convention show that the Founders generally accepted that the purpose of treaties was, as James Madison put it, to regulate "intercourse with foreign nations," and that the "exercise" of the Treaty Power was expected to be "consistent with" those "external" ends.[11] 3 *The Debates in*

---

[11] Other Founders shared Madison's understanding that the Treaty Power would be limited to matters involving foreign affairs. *Cf.* The Federalist No. 64 (John Jay) (noting that the "power of making treaties is an important one, especially as it relates to war, peace, and commerce"); The Federalist No. 75 (Alexander Hamilton) (stating that treaties "[were] not rules prescribed by the sovereign to the subject, but agreements between sovereign and sovereign"). Notwithstanding the Founders' view of the Treaty Power's inherent limits, there is, again, nothing in the Constitution's text explicitly confining that power. The basis for that omission is perhaps best explained by Madison, who, like others, recognized the need for flexibility with respect to the Treaty Power and cautioned against expressly defining its scope:

I do not think it possible to enumerate all the

*The Several State Conventions on the Adoption of the Constitution* 514-15 (Jonathan Elliot ed., 2d ed. 1941) ("*The Virginia Debates*"); *see* The Federalist No. 45 (James Madison) (stating that the Treaty Power "will be exercised principally on external objects, as war, peace, negotiation, and foreign commerce"). As Madison later explained, if there was

> no limitation on the Treaty-making power …, it might admit of a doubt whether the United States might not be enabled to do those things by Treaty which are forbidden to be done by Congress …; but *no such consequence can follow, for it is a sound rule of construction, that what is forbidden to be done by all the branches of Government conjointly, cannot be done by one or more of them separately*.

5 Annals of Congress 671 (1796) (emphasis added).

---

> cases in which such external regulations would be necessary. Would it be right to define all the cases in which Congress could exercise this authority[?] The definition might, and probably would, be defective. They might be restrained, by such a definition, from exercising the authority where it would be essential to the interest and safety of the community. It is most safe, therefore, to leave it to be exercised as contingencies may arise.

*The Virginia Debates*, *supra*, at 514-15.

Early cases followed that reasoning and indicated that the Treaty Power is confined to matters traditionally understood to be of international concern. *See, e.g.*, *Ross v. McIntyre*, 140 U.S. 453, 463 (1891) ("The treaty-making power vested in our government extends to all proper subjects of negotiation with foreign governments."); *De Geofroy v. Riggs*, 133 U.S. 258, 266 (1890) ("That the treaty power of the United States extends to all proper subjects of negotiation between our government and the governments of other nations is clear."); *Holden v. Joy*, 84 U.S. (17 Wall.) 211, 243 (1872) ("[I]nasmuch as the power is given, in general terms, without any description of the objects intended to be embraced within its scope, it must be assumed that the framers of the Constitution intended that it should extend to all those objects which in the intercourse of nations had usually been regarded as the proper subjects of negotiation and treaty … .").

That is not to say, however, that any treaty encroaching on matters ordinarily left to the states was considered to be beyond the Treaty Power's permissible ambit. On the contrary, so long as the subject matter limitation was satisfied – which it undoubtedly was in cases involving "subjects [such as] peace, alliance, commerce, neutrality, and others of a similar nature," William Rawle, *A View of the Constitution of the United States* 65 (2d ed. 1829), or, as Jay put it, "war, peace, and commerce," The Federalist No. 64 (John Jay) – it was accepted that treaties could affect domestic issues. Many early decisions of the Supreme Court upheld treaties of that nature, including treaties regarding the ownership and transfer of property. *See, e.g.*, *Carneal v. Banks*, 23 U.S. (10 Wheat.) 181, 189 (1825) (treaty between the United States and France that allowed citizens of either

country to hold lands in the other). Still, it was widely accepted that the Treaty Power was inherently limited in the subject matter it could properly be used to address, *see Santovincenzo v. Egan*, 284 U.S. 30, 40 (1931) ("The treatymaking power is broad enough to cover all subjects that properly pertain to our foreign relations … ."); *Asakura v. City of Seattle*, 265 U.S. 332, 341 (1924) ("The treaty-making power of the United States … does not extend 'so far as to authorize what the Constitution forbids,' … [but] does extend to all proper subjects of negotiation between our government and other nations."), and that the purpose of limiting the Treaty Power to matters which "in the ordinary intercourse of nations had usually been made subjects of negotiation and treaty" was to ensure that treaties were "consistent with … the distribution of powers between the general and state governments," *Holmes v. Jennison*, 39 U.S. (14 Pet.) 540, 569 (1840).

Despite the long history of that view of the Treaty Power, the tide of opinion, at least in some quarters, has shifted decisively in the last half-century. Many influential voices now urge that there is no limitation on the Treaty Power, at least not in the way understood from the founding through to the middle of the Twentieth Century.[12]   *See*

---

[12] Although at least one commentator has disputed that shift, *see* Golove, *supra*, at 1281, 1289 (stating that "commentators … have not rejected subject matter limitations" to the treaty power and arguing that, "[w]ere the President and Senate to make a treaty on a subject inappropriate for negotiation and agreement, and thus beyond the scope of the treaty power, the treaty would be invalid under the Tenth Amendment"), even then it has been

25

Bradley, *supra*, at 433 (describing the "rejection of a subject

acknowledged that "the traditional subject matter limitations on treaties are very general, and with globalization, the matters appropriate for treaties have expanded and will continue to do so," *id.* at 1291. That reality has been borne out by the kinds of conventions now extant in the international community. *See* Bradley, *supra*, at 397 n.29 (citing to, *inter alia*, the Convention on the Rights of the Child, *open for signature* Nov. 20, 1989, 28 I.L.M. 1456 (1989); the Convention on the Elimination of All Forms of Discrimination Against Women, S. Exec. Rep. No. 103-38 (1994); and the International Covenant on Economic, Social, and Cultural Rights, *open for signature* Dec. 19, 1966, 6 I.L.M. 360 (1967)). Considering the expanding subjects taken up in treaty-making and the nebulous standards associated with any lingering subject matter limitation, *see* Golove, *supra*, at 1090 ("The implication is clear: the President and Senate can make treaties on any subject *appropriate for negotiation* and agreement among states." (emphasis added)); Laurence H. Tribe, *Taking Text and Structure Seriously: Reflections on Free-Form Method in Constitutional Interpretation*, 108 Harv. L. Rev. 1221, 1261 n.133 (1995) ("The Treaty Power is legitimate only for international agreements *fairly related* to foreign relations" (emphasis added)), whether the subject matter limitation has fully eroded is a serious question. For now, however, it is enough to note that, at least among certain commentators, it is no longer viewed as a meaningful restraint on the Treaty Power. *Cf.* Henkin, *supra*, at 197 & n.89 (citing the Third Restatement for the proposition that a limitation on the Treaty Power to matters of international concern "has now been authoritatively abandoned").

matter limitation on the treaty power" as "the accepted view"). That change is reflected in the Restatement (Third) of Foreign Relations Law of the United States (1987) (the "Third Restatement"), which declares flatly that,"[c]ontrary to what was once suggested, the Constitution does not require that an international agreement deal only with 'matters of international concern.'"[13] Third Restatement § 302 cmt. c; *see id.* § 303(1) ("[T]he President, with the advice and consent of the Senate, may make any international agreement of the United States in the form of a treaty.").

Whatever the Treaty Power's proper bounds may be, however, we are confident that the Convention we are dealing with here falls comfortably within them. The Convention, after all, regulates the proliferation and use of chemical weapons. One need not be a student of modern warfare to have some appreciation for the devastation chemical weapons can cause and the corresponding impetus for international collaboration to take steps against their use. Given its quintessentially international character, we conclude that the Convention is valid under any reasonable conception of the Treaty Power's scope. In fact, as we discuss at greater length herein, because the Convention relates to war, peace, and

---

[13] It, evidently, is not alone in that view. *See, e.g.*, Tribe, *supra*, at 1261 n.133 ("[E]stablishment of a joint, binational health care system by a treaty followed by implementing legislation would presumably be possible … ."); Henkin, *supra*, at 474 ("[W]hat is essentially a matter of 'domestic concern' becomes a matter of 'international concern' if nations do, in fact, decide to bargain about it.").

perhaps commerce,[14] it fits at the core of the Treaty Power. *See infra* note 18.

2. *Interpreting* Holland

Because *Holland* clearly instructs that "there can be no dispute about the validity of [a] statute" that implements a valid treaty, 252 U.S. at 432, the constitutionality of Bond's prosecution would seem to turn on whether the Act goes beyond what is necessary and proper to carry the Convention into effect, or, in other words, whether the Act fails to "bear a rational relationship to" the Convention, *Lue*, 134 F.3d at 84. According to Bond, however, only a simplistic reading of *Holland* could lead one to think that the Supreme Court was saying that "Congress's power to implement treaties is subject to no limit other than affirmative restrictions on government power like the First Amendment." (Appellant's Supp. Reply Br. at 9-10.)

The problem with Bond's attack is that, with practically no qualifying language in *Holland* to turn to, we are bound to take at face value the Supreme Court's statement that "[i]f the treaty is valid there can be no dispute about the validity of the statute … as a necessary and proper means to execute the powers of the Government." 252 U.S. at 432. A plurality of the Supreme Court itself apparently gave that passage the simplistic reading Bond denounces when it said, in *Reid v. Covert*, 354 U.S. 1 (1957), that:

---

[14] Because we conclude that the Act is valid under the Necessary and Proper Clause, we express no opinion as to the merits of the Government's newly-discovered Commerce Clause argument.

> The Court [in *Holland*] was concerned with the Tenth Amendment which reserves to the States or the people all power not delegated to the National Government. To the extent that the United States can validly make treaties, the people and the States have delegated their power to the National Government and the Tenth Amendment is no barrier.

*Id.* at 18.

It is true that Justice Holmes spoke later in *Holland* in language that implies a balancing of the national interest against the interest claimed by the State, *see Holland*, 252 U.S. at 435 ("Here a national interest of very nearly the first magnitude is involved."), but that was in the context of assessing the validity of the Migratory Bird Treaty itself, not the implementing statute. That the latter was constitutional in light of the validity of the former seemed to the Supreme Court to require no further comment at all.[15]

---

[15] Bond recognizes that the *Holland* court "treated the legislation and treaty as co-extensive." (Appellant's Supp. Br. at 23.) Her conclusion from that is that when a treaty and its implementing legislation are not coextensive, the justification for enacting the legislation under the Necessary and Proper clause can collapse. We do not disagree; as noted, a treaty and treaty-implementing legislation must be "rationally related." *Ferreira*, 275 F.3d at 1027. As we discuss at greater length *infra*, however, the Act and the Convention with which we are dealing here are coextensive at least on the question of "use," which is the only point relevant to Bond's as-applied challenge. *See infra* Part II.B.3.

That does not mean, of course, that the *Holland* court would have spoken in the same unqualified terms had it foreseen the late Twentieth Century's changing claims about the limits of the Treaty Power, or had it been faced with a treaty that transgressed the traditional subject matter limitation.[16] *See id.* at 433 ("The case before us must be considered in light of our whole experience and not merely in that of what was said a hundred years ago."). It may well have chosen to say more about how to assess the validity of a treaty, and hence of coextensive treaty-implementing legislation. Perhaps *Holland*'s vague comment about "invisible radiation[s] from the general terms of the Tenth Amendment," *id.* at 434, would have been given some further

---

[16] The treaty at issue in *Holland* involved a subject of traditional international concern. *See* 56 Cong. Rec. 7361 (1918) (legislative testimony that the Migratory Bird Treaty Act "is essential to the preservation of our cotton, grain, and timber crops, whilst the migratory game birds contribute materially to our food supply. The bill may well be considered a measure of importance as affecting the successful prosecution of the war in which we are now engaged"). As the *Holland* court noted, "nothing in the Constitution … compel[led] the Government to sit by while a food supply [was] cut off and the protectors of our forests and our crops [were] destroyed." 252 U.S. at 435. Consequently, the treaty dealt with "a national interest of very nearly the first magnitude" that could "only [be furthered] by national action in concert with that of another power." *Id.* at 435; *see id.* at 433 (stating that the treaty dealt with a "matter[] of the sharpest exigency" and that "the States individually [were] incompetent to act").

30

explication.  As we have previously described, when *Holland* was decided, and, more importantly, when the Founders created the Treaty Power, it was generally understood that treaties should concern only matters that were clearly "international" in character, matters which, in *Holland*'s words, invoke a national interest that "can be protected only by national action in concert with that of another [sovereign nation]."  *Id.* at 435.  All the authors of The Federalist Papers, along with others from that era, considered the Treaty Power to be a necessary attribute of the central government for the important but limited purpose of permitting our "intercourse with foreign nations," *The Virginia Debates*, *supra*, at 514 (statement of James Madison), and thereby allowing for compacts "especially as [they] relate[] to war, peace, and commerce," The Federalist No. 64 (John Jay); *see supra* Part II.B.1.  It was not a general and unlimited grant of power to the federal government.[17]

---

[17] That the Founders understood Article II, § 2 to be a limited grant of power is clear, as the Tenth Amendment itself verifies.  The available evidence of their thinking is that they did not intend for treaties to become a vehicle to usurp the general powers reserved to the states.  *Cf. United States v. Pink*, 315 U.S. 203, 230 (1942) ("It is of course true that even treaties with foreign nations will be carefully construed so as not to derogate from the authority and jurisdiction of the States of this nation unless clearly necessary to effectuate the national policy."); *Holmes*, 39 U.S. at 569 ("The power to make treaties … was designed to [be] … consistent with … the distribution of powers between the general and state governments.").

Because an implied subject matter limitation on the Treaty Power was a given at the time *Holland* was written, it was enough to answer the states' rights question in that case by pointing out that the Tenth Amendment only reserves those powers that are not delegated and that "the power to make treaties is delegated expressly." 252 U.S. at 432. Thus, *Holland*'s statement that "there can be no dispute about the validity" of a statute implementing a valid treaty, *id.*, is sensible in context and, in any event, binds us. We do not discount the significance of the Supreme Court's emphasis on the important role that federalism plays in preserving individual rights, *Bond II*, 131 S. Ct. at 2364, and it may be that there is more to say about the uncompromising language used in *Holland* than we are able to say,[18] but that very direct

---

[18] We pause to consider how, if *Holland* were not so clear in its "valid treaty equal valid implementing legislation" holding, treaties and implementing legislation might usefully be reviewed in light of the apparently evolving understanding of the Treaty Power that we have described. *See supra* Part II.B.1. The Founders deliberately drafted Article II, § 2 without defining the limits of the Treaty Power because they decided its scope required flexibility in the face of unknowable future events. *Cf. The Virginia Debates*, *supra*, at 514-15 (James Madison's observation that "it [is not] possible to enumerate all the cases in which such external regulations would be necessary. … It is most safe, therefore, to leave it to be exercised as contingencies may arise"). We do not second guess the wisdom of their choice and acknowledge that any attempt to precisely define a subject matter limitation on the Treaty Power would involve political judgments beyond our ken. *Cf. Baker v. Carr*, 369 U.S. 186, 211 (1962) (stating that resolution of issues "touching foreign

relations" often "turn on standards that defy judicial application, or involve the exercise of a discretion demonstrably committed to" a coordinate branch); *Pink*, 315 U.S. at 232 ("[T]he field which affects international relations is 'the one aspect of our government that from the first has been most generally conceded imperatively to demand broad national authority' … ." (citation omitted)); *Lue*, 134 F.3d at 83 ("[I]t is not the province of the judiciary to impinge upon the Executive's prerogative in matters pertaining to foreign affairs.").

Nevertheless, while the outer boundaries of the Treaty Power may be hard to delineate, we can safely say that certain kinds of treaties fall within the core of that power, namely those dealing with war, peace, foreign commerce, and diplomacy directed to those ends. *See* The Federalist No. 45 (James Madison) (stating that the Treaty Power "will be exercised principally on external objects, as war, peace, negotiation, and foreign commerce"); The Federalist No. 64 (John Jay) (stating the "power of making treaties is an important one, especially as it relates to war, peace, and commerce"). As to treaties of such character, it is hard to argue with the reasoning in *Holland* that, because "the power to make treaties is delegated expressly," 252 U.S. at 432, the Tenth Amendment has nothing meaningful to say. However, just as some treaties may fall comfortably within the traditionally understood bounds of the Treaty Power, some may be negotiated that will plainly fall outside that scope. If such a treaty were challenged, a court would be bound to take up an issue not present here, namely whether and when a treaty has reached a constitutional boundary, *see Marbury v. Madison*, 5 U.S. (1 Cranch) 137, 177 (1803) ("It is emphatically the province and duty of the judicial department

to say what the law is."); *cf. Baker*, 369 U.S. at 211 (observing that not "every case or controversy which touches foreign relations lies beyond judicial cognizance"), recognizing that a treaty falling outside the limits of the Treaty Power would be unconstitutional as ultra vires, *cf.* Joseph Story, *Commentaries on the Constitution of the United States* 339 (Melville M. Bigelow, ed. 5th ed. 1994) (1891) ("A treaty to change the organization of the government, or annihilate its sovereignty, to overturn its republican form, or to deprive it of its constitutional powers, would be void."). The deliberately vague boundaries of the Treaty Power would probably relegate that court to the unenviable position of saying it knew a violation when it saw one.

Before the outer limits of the treaty power are reached, however, it may be that federalism does have some effect on a treaty's constitutionality. While it is not our prerogative to ignore *Holland*'s rejection of federalism limitations upon the Treaty Power, the Supreme Court could clarify whether principles of federalism have any role in assessing an exercise of the Treaty Power that goes beyond the traditionally understood subject matter for treaties. *Holland* itself indicates that "invisible radiation[s] from the general terms of the Tenth Amendment" may be pertinent in deciding whether there is any space between obviously valid treaties and obviously ultra vires treaties and whether, in that space, some judicial review of treaties and their implementing legislation may be undertaken to preserve the federal structure of our government. The "invisible radiation[s]" imagery, 252 U.S. at 433-34, is unusual but, in light of current conceptions about the breadth of the Treaty Power, it may well be worth taking seriously. *Cf. Printz*, 521 U.S. at 921-22 (stating that the

34

language demands from us a direct acknowledgement of its meaning, even if the result may be viewed as simplistic. If there is nuance there that has escaped us, it is for the Supreme Court to elucidate.

### 3. *The Necessary and Proper Clause*

Thus, because the Convention falls comfortably within the Treaty Power's traditional subject matter limitation, the Act is within the constitutional powers of the federal government under the Necessary and Proper Clause and the Treaty Power, unless it somehow goes beyond the Convention. Bond argues that it does.[19]

She says that the Act covers a range of activity not actually banned by the Convention and thus cannot be sustained by the Necessary and Proper Clause. Whether that argument amounts to a facial or an as-applied attack on the Act, *see supra* note 5, it fails. We stated in *Bond I* that "Section 229 … closely adheres to the language of the …

------

concept of dual sovereignty was "one of the Constitution's structural protections of liberty").

[19] As Judge Rendell correctly points out in her concurrence, Bond's emphasis is entirely misplaced to the extent she may be contending that her prosecution violates the Necessary and Proper Clause because the United States did not have to prosecute her to comply with its obligations under the Convention. (*See* Rendell Concurrence Op. at 3 ("Examining the scope of Congress's Necessary and Proper Power by definition requires us to examine the Act, not its enforcement.").)

Convention," 581 F.3d at 138, and so it does. True, as Bond notes, the Convention bans persons from using, developing, acquiring, stockpiling, or retaining chemical weapons, 32 I.L.M. at 804, while the Act makes it unlawful to "receive, stockpile, retain, own, possess, use, or threaten to use" a chemical weapon, 18 U.S.C. § 229(a)(1), but those differences in wording do not prove that the Act has materially expanded on the Convention. *See United States v. Belfast*, 611 F.3d 783, 806 (11th Cir. 2010) ("[T]he existence of slight variances between a treaty and its congressional implementing legislation do not make the enactment unconstitutional; identicality is not required."). The meaning of the list in the former seems rather to fairly encompass the latter (with the possible exception of the "threaten to use" provision of the Act) and, if the Act goes beyond the Convention at all, does not do so in the "use" aspect at issue here.

So while Bond's prosecution seems a questionable exercise of prosecutorial discretion,[20] and indeed appears to justify her assertion that this case "trivializes the concept of chemical weapons" (Appellant's Supp. Br. at 53), the treaty that gave rise to it was implemented by sufficiently related legislation. *See Comstock*, 130 S. Ct. at 1956 ("[I]n determining whether the Necessary and Proper Clause grants Congress the legislative authority to enact a particular federal statute, we look to see whether the statute constitutes a means that is rationally related to the implementation of a

---

[20] The decision to use the Act – a statute designed to implement a chemical weapons treaty – to deal with a jilted spouse's revenge on her rival is, to be polite, a puzzling use of the federal government's power.

constitutionally enumerated power."); *Lue*, 134 F.3d at 84 (rejecting the argument "that because the Hostage Taking Convention targets a specific aspect of international terrorism – hostage taking – the statute effectuating the Convention must deal narrowly with international terrorism or risk invalidity" as a "cramped" view of Congressional authority, because treaty-implementing legislation must simply "bear a rational relationship to a permissible constitutional end").

In short, because the Convention pertains to the proliferation and use of chemical weapons, which are matters plainly relating to war and peace, we think it clear that the Convention falls within the Treaty Power's core. *See supra* note 18. Consequently, we cannot say that the Act disrupts the balance of power between the federal government and the states, regardless of how it has been applied here. *See Gonzales v. Raich*, 545 U.S. 1, 23 (2005) ("[W]here the class of activities is regulated and that class is within the reach of federal power, the courts have no power to excise, as trivial, individual instances of the class." (citations and internal quotation marks omitted));[21] *Holland*, 252 U.S. at 432 ("If the

---

[21] Although we acknowledge that the *Raich* court's admonition against excising a class of activities from a valid assertion of federal power may have related to its status as a Commerce Clause case based on the aggregation principle employed in that context, *see* Richard H. Fallon, Jr., *Fact and Fiction About Facial Challenges*, 99 Cal. L. Rev. 915, 936 (2011) (opining that *Raich* "can be read as rejecting the possibility of successful as-applied challenges to assertions of legislative power under the Commerce Clause"), the principle would seem to hold with respect to federalism challenges arising from treaties within the Treaty Power's core. As we

treaty is valid there can be no dispute about the validity of the [implementing] statute … ."); *cf.* U.S. Const. art. VI, cl. 2 ("[A]ll Treaties made … shall be the supreme Law of the Land.").

## III. Conclusion

For the foregoing reasons, we will affirm the judgment of conviction.

---

have already observed, *see supra* note 18, it is hard to argue with *Holland*'s rejection of federalism as an applicable concept as far as such treaties are concerned.

RENDELL, <u>Circuit Judge</u>, concurring.

I fully agree with the Majority's reasoning and result. I write separately to cast the issue before us in a somewhat different light, by expanding upon two aspects of the Majority's reasoning which, I believe, decide this case. As it crystallized before us at oral argument, Ms. Bond's challenge has little to do with the validity of the Convention. Her problem lies with the Act. She contends that the structure of federal-state relations is such that the Act should not apply to her actions, namely, conduct involving a domestic dispute that could be prosecuted under state law.[1] But, as the Majority rightly concludes, the Act is a valid exercise of Congress's Necessary and Proper Power. Moreover, no jurisprudential principle, grounded in federalism or elsewhere, saves her from the Act's reach.

I consider two questions raised by her argument: What is legally wrong with the Act, which reaches Ms. Bond's conduct?; and, What is wrong with the Act's application to

---

[1] As her counsel argued:

> And it really inheres in the statute. It's not that there's anything wrong in the abstract with the United States ratifying this treaty. That's not where the problem is.
> The problem is either at the moment they passed the statute that necessarily went this far or at the point that it becomes applied in this kind of situation.

(3d Cir. Argument at 13.)

Ms. Bond, given the structure of federal-state relations?  The answer to both is: Nothing.

As to the first question, nothing "wrong" occurred at the moment Congress passed the Act.  As the Majority has thoroughly discussed, the Convention itself is valid—indeed, Ms. Bond unequivocally concedes that point.  In turn, the Act, which implements the Convention, is valid as an exercise of Congress's Necessary and Proper Power.  That is because the Necessary and Proper Clause affords Congress "'ample means'" to implement the Convention, and gives Congress the authority "to enact laws that are 'convenient, or useful' or 'conducive' . . . to the 'beneficial exercise'" of the federal government's Treaty Power.  *United States v. Comstock*, 130 S. Ct. 1949, 1956 (2010) (quoting *McCullogh v. Maryland*, 4 Wheat. 316, 408, 413, 418 (1819)).  There is no question that the Act is rationally related to the Convention; it faithfully tracks the language of the Convention.  Enacting a statute that essentially mirrors the terms of an underlying treaty is plainly a means which is "reasonably adapted to the attainment of a legitimate end"—ensuring that the United States complies with our international obligations under a valid treaty. *Comstock*, 130 S. Ct. at 1957 (internal quotation marks and citations omitted); *see also United States v. Lue*, 134 F.3d 79, 84 (2d Cir. 1998) (upholding a statute implementing a treaty where "[t]he Act here plainly bears a rational relationship to the Convention; indeed, it tracks the language of the Convention in all material respects").

In examining the constitutionality of Congress's exercise of its Necessary and Proper Power, we need not consider whether the prosecution of Ms. Bond is necessary and proper to complying with the Convention, as she would

2

have us do. In other words, she argues that no nation-state would submit that the United States has failed to comply with its obligations under the Convention if the federal government did not prosecute Ms. Bond under the Act. But that is not the appropriate test. Examining the scope of Congress's Necessary and Proper Power by definition requires us to examine the Act, not its enforcement. To determine if the Act is necessary and proper, we ask whether it bears a rational relationship to the Convention. *See Comstock*, 130 S. Ct. at 1956 ("[I]n determining whether the Necessary and Proper Clause grants Congress the legislative authority to enact a particular federal statute, we look to see whether the statute constitutes a means that is rationally related to the implementation of a constitutionally enumerated power."). Ms. Bond's actions fall plainly within the terms of the Act, and the Act bears a rational relationship to the Convention. So ends the Necessary and Proper inquiry.

The foregoing conclusion is enough to affirm Ms. Bond's conviction. As the Majority correctly reasons, *Missouri v. Holland*, 252 U.S. 416 (1920), forecloses challenging a valid statute implementing a valid treaty on Necessary and Proper grounds or federalism grounds. *See* Maj. Op. at 31-35; *Holland*, 252 U.S. at 432 ("If the treaty is valid there can be no dispute about the validity of the statute" under the Necessary and Proper Clause).

But even if Ms. Bond were able to assert a federalism challenge to her conviction, she proposes no principle of federalism that would limit the federal government's authority to prosecute her under the Act. Thus, as to the second question, Ms. Bond argues that if the statute is applied to her, and, is thus read to "criminalize every malicious use of

3

poisoning," then principles of federalism are violated by disturbing the division of power between the federal government and the states. (3d Cir. Argument at 15.) As appealing as the argument sounds—that a federal statute should not reach an essentially local offense like this—there is in fact no principled reason to limit the Act's reach when her conduct is squarely prohibited by it. The fact that an otherwise constitutional federal statute might criminalize conduct considered to be local does not render that particular criminalization unconstitutional. As the Supreme Court explained in *Gonzales v. Raich*, when "the class of activities is regulated and that class is within the reach of federal power, the courts have no power to excise, as trivial, individual instances of the class." 545 U.S. 1, 23 (2005) (internal quotation marks and citations omitted). The fact that the Act, which properly implements a valid treaty, reaches non-terrorist uses of chemical weapons leaves us powerless to excise such an individual instance. True, *Raich* involved Congress's Commerce Clause Power. But the Majority is correct to apply its principle to this case, particularly in light of the Supreme Court's rejection, in *Holland*, of federalism as a basis to challenge a statute implementing an otherwise valid treaty. *See* Maj. Op. at 37 n.21; *Holland*, 252 U.S. at 432.

Ms. Bond continues to urge otherwise, asking us to consider the "world where the Supreme Court recognizes that the Tenth Amendment is primarily about protecting individual liberty," (3d Cir. Argument at 74), and to find controlling here cases like *New York v. United States*, 505 U.S. 144 (1992), and *Printz v. United States*, 521 U.S. 898 (1997), in which the Supreme Court recognized that some acts of Congress, even if they are otherwise valid under an enumerated power, can run afoul of the Tenth Amendment.

4

But this case is not like *New York* or *Printz*, in which Congress wrongfully commandeered states' legislative processes and public officials. Nothing in those cases suggests a principle of federalism that would apply to this case.

Moreover, it is not enough to urge, as Ms. Bond does, that Pennsylvania law and authorities are equally able to handle, and punish, this conduct so that, from a federalism standpoint, we should leave the matter to Pennsylvania. That view simply misstates the law. We have a system of dual sovereignty. Instances of overlapping federal and state criminalization of similar conduct abound. But Ms. Bond argues that here, unlike the case with other federal crimes, no federal interest is being served by prosecuting every malicious use of a chemical. That argument fails for two reasons. First, there exists nowhere in the law a rule requiring that a statute implementing a treaty contain an element explicitly tying the statute to a federal interest so as to ensure that a particular application of the statute is constitutional. *Cf. United States v. Wilson*, 73 F.3d 675, 685 (7th Cir. 1995) (reasoning that a jurisdictional element is not constitutionally required in a federal criminal statute enacted pursuant to Congress's Commerce Clause authority). Second, even if we were to require that there be a clear federal interest, Ms. Bond incorrectly characterizes the federal interest that is represented by her prosecution as one in prosecuting every malicious use of a chemical. Rather, the federal interest served is twofold: combating the use and proliferation of chemical weapons, and complying with the United States'

5

obligations under a valid treaty.[2]  *See* Chemical Weapons Convention, art. VII.1, 32 I.L.M. 800, 810 (1993) (requiring each signatory nation to, "in accordance with its constitutional processes, adopt the necessary measures to implement its obligations under this Convention"). Additionally, whether there is a distinction, and where that distinction lies, between combating the use and proliferation of chemical weapons and prosecuting the malicious use of a chemical, is exceedingly difficult to discern.

In sum, Congress passed the Act, which is constitutionally sound legislation, to implement the Convention, a constitutionally sound treaty.  Ms. Bond's appeal generally to federalism, rather than to a workable principle that would limit the federal government's authority to apply the Act to her, is to no avail.

The real culprits here are three.  First, the fact pattern. No one would question a prosecution under the Act if the defendant were a deranged person who scattered potassium dichromate and 10-chloro-10H-phenoxarsine, the chemicals which Ms. Bond used, on the seats of the New York subway cars.  While that defendant could be punished under state law, applying the Act there would not offend our sensibilities.  The

---

[2] I agree with Ms. Bond that states sometimes also bear some responsibility for ensuring compliance with our treaty obligations.  *See Medellín v. Texas*, 552 U.S. 491 (2008).  But that fact does not nullify Congress's authority to pass treaty-implementing legislation so as to ensure uniform, nationwide compliance with our international obligations, nor does it suggest that Congress lacks the power to do so.

application, however, to this "domestic dispute," somehow does.

Second, the "use" of chemical weapons as prescribed in the Act has an admittedly broad sweep. *See* Maj. Op. at 11 n.7; Chemical Weapons Convention, art. VII.1(a), 32 I.L.M. at 810 (requiring each signatory nation to "[p]rohibit natural and legal persons anywhere on its territory . . . from undertaking any activity prohibited . . . under this Convention, including enacting penal legislation with respect to such activity"). Because the Act tracks the Convention, however, Congress had the power to criminalize all such uses. Perhaps, in carrying out the United States' treaty obligations, Congress could have created a more expansive exception for "peaceful purposes," but it did not.

Lastly, the decision to prosecute is troubling. The judgment call to prosecute Ms. Bond under a chemical weapons statute rather than allowing state authorities to process the case is one that we question. But we see that every day in drug cases. Perhaps lured by the perception of easier convictions and tougher sentences, prosecutors opt to proceed federally. *See* Steven D. Clymer, *Unequal Justice: The Federalization of Criminal Law*, 70 S. Cal. L. Rev. 643, 668-75 (1997). There is no law against this, or principle that we can call upon, to limit or regulate it.

While the Majority opinion explores arguments regarding the limits of the Treaty Power, I find Ms. Bond's argument to be much more limited in scope, although equally unsupportable. I agree that we should affirm the judgment of the District Court.

AMBRO, <u>Circuit Judge</u>, concurring.

I concur in the result reached by Judge Jordan's thoughtful opinion. I write separately to urge the Supreme Court to provide a clarifying explanation of its statement in *Missouri v. Holland* that "[i]f [a] treaty is valid there can be no dispute about the validity of the statute [implementing that treaty] under Article 1, Section 8, as a necessary and proper means to execute the powers of the Government." 252 U.S. 416, 432 (1920).[1]

Absent that undertaking, a blank check exists for the Federal Government to enact any laws that are rationally related to a valid treaty and that do not transgress affirmative constitutional restrictions, like the First Amendment. This acquirable police power, however, can run counter to the fundamental principle that the Constitution delegates powers to the Federal Government that are "few and defined" while the States retain powers that are "numerous and indefinite." The Federalist No. 45 (James Madison).

---

[1] As I noted in our Court's previous opinion in this case, *see United States v. Bond*, 581 F.3d 128, 135 (3d Cir. 2009), *rev'd in part by*, *Bond v. United States*, 131 S.Ct. 2355 (2011), the scope and persuasiveness of *Holland* has generated much academic debate. *See, e.g.*, Nicholas Quinn Rosenkranz, *Executing The Treaty Power*, 118 Harv. L. Rev. 1867 (2005); Edward T. Swaine, *Does Federalism Constrain the Treaty Power?*, 103 Colum. L. Rev. 403 (2003); Curtis A. Bradley, *The Treaty Power and American Federalism*, 97 Mich. L. Rev. 390 (1998).

Since *Holland*, Congress has largely resisted testing the outer bounds of its treaty-implementing authority. *See* Peter J. Spiro, *Resurrecting* Missouri v. Holland, 73 Mo. L. Rev. 1029 (2008). But if ever there were a statute that did test those limits, it would be Section 229. With its shockingly broad definitions, Section 229 federalizes purely local, run-of-the-mill criminal conduct. The statute is a troublesome example of the Federal Government's appetite for criminal lawmaking.[2] Sweeping statutes like Section 229 are in deep tension with an important structural feature of our Government: "'The States possess primary authority for defining and enforcing the criminal law.'" *Brecht v. Abrahamson*, 507 U.S. 619, 635 (1993) (quoting *Engle v. Isaac*, 456 U.S. 107, 128 (1982)); *see also Patterson v. New York*, 432 U.S. 197, 201 (1977) ("It goes without saying that preventing and dealing with crime is much more the business of the States than it is of the Federal Government . . . .").

---

[2] "[T]he federal criminal code now includes at least 4,450 crimes. Congress added an average of 56.5 crimes per year to the federal code between 2000 and 2007 and has raised the total number of federal crimes by 40 percent since 1970. Moreover, the federal criminal code has grown not just in size but in complexity, making it difficult to both (1) determine what statutes constitute crimes and (2) differentiate whether a single statute with different acts listed within a section or subsection includes more than a single crime and, if so, how many." John C. Eastman, *The Outer Bounds of Criminal Law: Will Mrs. Bond Topple* Missouri v. Holland*?*, 2011 Cato. Sup. Ct. Rev. 185, 193 (2011) (internal footnotes, quotation marks, and alterations omitted).

I hope that the Supreme Court will soon flesh out "[t]he most important sentence in the most important case about the constitutional law of foreign affairs," Nicholas Quinn Rosenkranz, *Executing The Treaty Power*, 118 Harv. L. Rev. 1867, 1868 (2005), and, doing so, clarify (indeed curtail) the contours of federal power to enact laws that intrude on matters so local that no drafter of the Convention contemplated their inclusion in it.